CANDEE v. KANSAS CITY & INDEPENDENCE RAPID TRANSIT RAILWAY, *Appellant.*

Division Two, July 12, 1895.

1. **Negligence**: RAILROAD: TRESPASSER ON TRACK: DEFECTIVE HEARING AND SIGHT: INSTRUCTIONS. Defendant's servants in charge of its train, seeing plaintiff, a trespasser, walking on its track several hundred feet in advance of the train, sounded the whistle and rang the bell, to which he paid no attention. Thereupon an ineffectual attempt was made to stop the train, which overtook plaintiff and injured him. Plaintiff introduced evidence showing that both his sight and hearing were defective. *Held,* that an instruction that plaintiff had no additional right of recovery by reason of defective hearing and eyesight, unless the jury found that the trainmen had knowledge of such defect, and that, in the absence of such knowledge, they had the right to presume that he had ordinary sight and hearing was correct.

2. **Supreme Court Practice**: APPEAL FROM MOTION GRANTING NEW TRIAL. Where the trial court in granting a new trial specifies the grounds of its action, as required by section 2241, Revised Statutes, 1889, and the party resisting the new trial appeals, the appellate court will confine itself to reviewing the action of the trial court for the reasons so specified.

*Appeal from Jackson Circuit Court.*—HON. J. H. SLOVER, Judge.

REVERSED AND REMANDED.

*Karnes, Holmes & Krauthoff* for appellant.

(1) Where a party "failed to object to the court's instructions at the time they were given, he can not afterward be heard to complain." *Lefkow v. Allred,* 54 Mo. App. 141. (2) "There was no exceptions saved to the giving of any instructions, and they need not be considered for that reason." *State v. Elvins,* 101 Mo. 243. (3) "It is not allowed to a defendant to raise

any objections to instructions, unless such party shows by the record that exceptions were taken at the time the instructions were given." *Baker v. Railroad*, 26 S. W. Rep. (Mo.) 20. (4) "A party wishing to avail himself of error in giving or refusing instructions must save his exceptions at the time they are given or refused, and it is too late to make his objections for the first time on a motion for a new trial." *Dozier v. Jerman*, 30 Mo. 216; *Waller v. Railroad*, 83 Mo. 608; *State v. Kennade*, 121 Mo. 405; *State v. Cantlin*, 118 Mo. 100. (5) The trial court erred in holding that defendant's first instruction was erroneous. *Schexnaydre v. Railroad*, 14 S. Rep. (La.) 513; Beach on Contributory Negligence, sec. 393; *Maloy v. Railroad*, 84 Mo. 270; *Tyler v. Sites*, 88 Va. 470.

*Beebe & Watson* for respondent.

(1) Plaintiff, in his motion for a new trial, challenged all the instructions given on behalf of defendant and the court had the power to set aside this verdict on its own motion, independent of the grounds urged in the motion for a new trial. *Lovell v. Davis*, 52 Mo. App. 347; *Hewitt v. Steele*, 24 S. W. Rep. 440; *Milling Co. v. White Line Tr. Co.*, 26 S. W. Rep. 707. (2) Defendant's first instruction was erroneous when applied to the facts of this case. Beach on Contributory Negligence, sec. 394; *Bunyan v. Railroad*, 29 S. W. Rep. 842.

GANTT, P. J.—The defendant is a railway corporation and operated a railroad between Kansas City and Independence at the time of the injuries complained of in plaintiff's petition.

Plaintiff alleged that in June, 1889, while he was walking on defendant's track, it carelessly, negligently

and wrongfully ran its engine and cars into and upon him and negligently failed to stop its said engine and train after discovering plaintiff in a situation of danger in time to have avoided injuring him, which could have been done by the exercise of ordinary care, and negligently failed to ring any bell or sound any whistle to warn plaintiff of the approach of said train, whereby he was greatly injured.

The answer was a general denial, and that whatever injuries he received were caused by his own negligence, in walking upon defendant's track at a point other than a crossing and while so walking was injured.

The cause was tried to a jury and the jury rendered a verdict for defendant. Plaintiff in due time filed his motion for a new trial which was sustained by the following order: "Now on this day come parties herein by attorney and the motion of plaintiff for a new trial being now taken up the same is by the court sustained, for the reason that the court erred in giving defendant's first instruction. To which ruling of the court said defendant excepts, and defendant now files affidavit for an appeal, which appeal is by the court allowed as prayed to the supreme court of Missouri and defendant is given ten days in which to file an appeal bond in the sum of $250 and ninety days in which to file bill of exceptions." In due time the appeal was perfected and the bill of exceptions signed and filed.

The evidence discloses that the defendant's railroad was a double track road. At the time of the accident the south track was not completed, and both east and west trains were using the north track.

Plaintiff testified that in June, 1889, he was walking from Kansas City to Washington Park on the left-hand track of defendant's railroad. He heard no train coming or any signal given. He testified he couldn't "hear quite as quick as some people and was

a little hard of hearing," but had no trouble to hear railroad whistles at that time. Was sixty-two years old, and had on glasses when he was hurt; that if he had looked back toward the train he would most assuredly have gotten off.

Frank D. Walker, a witness for plaintiff, testified the accident occurred about 10 o'clock in the forenoon; "I think it was a clear day." Plaintiff was struck about four or five hundred feet east of a cut of defendant's road.

"*Q.* Did you see the train as it came out of the cut that you speak of? *A.* I heard it whistle and looked around and saw it when the train was about halfway out of the cut.

"*Q.* Where was plaintiff at the time you saw the train coming out of the cut. *A.* He was walking on the track.

"*Q.* Was plaintiff walking in the direction of, or away from, the cut? *A.* He was walking away from it.

"*Q.* State whether or not that cut is at or near the intersection of Ninth street in Kansas City? *A.* No; it is near Tenth street.

"*Q.* What was there, if anything, to prevent the engineer and fireman in charge of said train from seeing plaintiff walking on the track of said railroad. *A.* There was nothing that I know of.

"*Q.* State what, if any, signals were given by the fireman or engineer in charge of said train from the time the engine came out of said cut until it struck the plaintiff. *A.* The engine whistled after they left the cut.

"*Q.* At the time they whistled, as you state, how far ahead of the train was plaintiff. *A.* I suppose it was about three hundred feet, more or less."

Plaintiff introduced three locomotive engineers, who testified as to the distance in which defendant's train could have been stopped. Charles F. Kirby fixed the distance at one hundred feet; E. J. Murray at "within seventy-five or a hundred feet," and A. W. Dobson at "from eighty to one hundred and twenty feet."

Dr. G. C. Stemen attended the plaintiff and treated him for his injuries. He testified:

"*Q.* Doctor, if you know, please state whether or not there is any defect in Mr. Candee's hearing. *A.* Yes, sir.

"*Q.* Please state what it is. *A.* Well, he is what we call hard of hearing, more so in one ear than in the other, but I can not tell which ear it is.

"*Q.* Do you know how long he has been affected in that ear. Did he make any statement to you about that? *A.* Yes, sir.

"*Q.* It was prior to the injury, was it not? *A.* Yes, sir.

"*Q.* Can you state whether any other of Mr. Candee's senses are defective besides his hearing? *A.* That of sight.

"*Q.* To what extent? *A.* He was compelled to wear glasses most of the time. I don't know in regard to that. I don't know whether he is compelled to wear glasses in order to get around or not.

"*Q.* Do you know he generally wears glasses. *A.* Yes, sir.

"*Q.* But the extent of the defect of the eyes you do not know? *A.* I do not know. I have not examined his eyes and could not say."

Walton H. Holmes, president of defendant, testified that defendant bought its road in March, 1889, from the company which had constructed it. At that time "it was a very poor single track road." In April

defendant commenced to put down a double track but at the time of the accident to plaintiff the south or right-hand track was not finished. "The north track was in a condition to operate on, and the other was not."

N. S. McKinney was a passenger on the train which struck the plaintiff. He testified:

"*Q.* What did you have to do with taking the plaintiff out from under the train? *A.* I helped to take him out.

"*Q.* Before he was struck and knocked down by the train, what did you hear, if anything, as to whistling or ringing of the bell? *A.* I heard both the ringing of the bell and whistling.

"*Q.* What time did that commence? *A.* Well, there was considerable of it done; I don't know hardly how long it was before, but there was considerable whistling, I know, just about the time of leaving the cut.

"*Q.* Now, so as to give the jury an idea of it, state as nearly as you can the nature of it? *A.* Well, it was rather loud, shrill whistling, because it made me think something was wrong, and I put my head out of the window to see what it was.

"*Q.* Have you heard whistling to alarm stock from the track? *A.* Yes, sir.

"*Q.* Was it anything like that? *A.* Yes, sir.

"*Q.* How much of this whistling and bell-ringing was there? *A.* Well, the train ran some little distance after it commenced before it stopped.

"*Q.* Was it once in a while, or continuous? *A.* It was continuous.

"*Q.* You say so much so as to attract your attention? *A.* Yes, sir."

Mr. Peterson, a hotel keeper in Independence, was also a passenger. He was asked:

"*Q.* Before plaintiff was struck, state whether you heard any whistle, or any bell ringing. *A.* I think as we approached the mouth of the cut going north the bell began to ring. That is the usual custom at all crossings, and there is a crossing right ahead there. The bell began to ring, and then the whistle sounded, as if approaching cattle on the track, and it kept on and kept on, and I jumped out on the platform to see what it was, and we commenced to set the brakes right quick, and the last sound of the whistle was a long sound of the whistle, and he set the brake like he had hold of the whistle and the air at the same time. He was setting the air brakes and whistling all at the same time.

"*Q.* What attracted your attention? *A.* The continual whistling."

Two locomotive engineers were offered by defendant and testified as to the distance in which defendant's train could have been stopped. They both fixed the distance at one hundred and fifty feet.

W. E. Reeves, who had been railroading twenty-four years, said: "In my judgment, that train ought to stop in one hundred and fifty or two hundred feet."

A. J. Batton, the engineer of the train which struck the plaintiff, fixed the distance at one hundred and fifty feet, and gave this graphic account of the occurrence:

"Well, just as I came out of the cut, this side of the curve, I seen a man ahead of me about four hundred feet, and the train went on about a hundred feet and the man stopped and turned right around, like that (illustrating), as if looking for a train. I then supposed he saw the train. But instead of getting off the track, he went ahead on the track again. He was then at a point about two hundred and ten feet, and I sounded the whistle, as if to frighten stock, to

warn him, or draw his attention, but I still see he paid no attention and made no effort to get off the track; and then, at a point about one hundred and thirty feet from him, I shut off steam, applied the brakes, reversed my engine and pulled the throttle open. I done all in my power to stop the train. Then I sounded the whistle continuously until the man was struck."

He also testified: "When he turned around and looked toward the train, the thought struck me that he had seen the train and would step off the track, as any ordinary man would do."

Mr. Patterson, a passenger on the train, testified:

"As we came out of the cut, or in the cut, I can't say just where, somewhere about the mouth of the cut, I heard a continuous whistling, which always attracts my attention on the road as calling for danger. It was very rapid, sharp whistling, and then brakes were applied to the driving wheels of the engine and the motion was reversed, and the train was stopped sooner than I ever saw a train stopped under the circumstances. I think when the train stopped the wheels were sliding, the brakes were applied so quick; that is my impression; I don't know that, however."

J. M. Buck, the fireman on the train which struck the plaintiff, testified:

"Q. Now, where was your train at the time you first saw Mr. Candee? A. We were about four hundred feet from where we struck him; we had just come out of the cut around the curve. This cut is about four hundred feet from where we struck him.

"Q. What was Mr. Candee doing at the time? A. Walking along on the track ahead of us.

"Q. I will ask you to state, Mr. Buck, when you discovered that Mr. Candee was on the track, what was done; whether you stopped? A. No, sir; as soon as

we came out of the cut, I began to ring the bell. We always ring for the crossing there. As soon as I saw him, we rang the bell, and he did not pay any attention to that, and then the engineer began to blow the whistle for him, and seeing that he paid no attention to that, the engineer began to stop.'' It was a "nice, sunshiny day.''

C. A. Wiseman, master mechanic of defendant, was on the train which struck the plaintiff. He testified:

"Q. State where this accident took place? A. It took place just west of Carey avenue.

"Q. How far west? A. Why, about twenty feet west of the crossing we picked the man up.

"Q. Tell the jury what signals were given, if any, and where? A. Well, there is a whistling post up in the cut for the station there and they always whistle for the station.

"Q. What did they do on this occasion? A. They whistled at the post for Elmwood station, and as we came down the bell was ringing, and he continued his whistling, and I looked ahead to see what I could see ahead of the train, but I didn't see anything, and then it stopped and I jumped and ran around on that side and saw there was a man under the pilot.

"Q. What was the character of the whistling? A. They were short, sharp blasts.

"Q. Is that the kind usually given for a danger signal? A. Yes, sir.''

W. A. Cook, assistant general manager of defendant, was also on the train. He testified:

"The usual whistle for that crossing was given at the whistling post in the cut. It wasn't but a second or two after that, just as we were leaving the cut, that a succession of quick, short blasts attracted my attention, and I stooped down to look out of the window,

expecting to see some cattle running off the track, and about that time the train began to steady and slack up, and he still continued to whistle, and of course about that time the train was stopped, and I supposed then that something was wrong, and I jumped off on the south side of the train. I didn't know what was the trouble until I got to the front of the engine."

In rebuttal, the plaintiff offered Hugh Menown, who testified:

"Q. What attracted your attention to the accident? A. The whistling."

The court gave all of plaintiff's instructions, which authorized the jury to find for plaintiff, notwithstanding he was a trespasser on the defendant's track if the engineer saw him on the track in a situation of peril and by the exercise of reasonable care could have avoided injuring him.

During the trial, no evidence offered by plaintiff was excluded and no evidence for defendant was admitted over his objections.

The instruction number 1 given for defendant, which the circuit court considered erroneous, was in these words:

"The court instructs the jury that the plaintiff has no additional right of recovery in this cause by reason of any defect of his hearing or eyesight, if you find any such existed, unless you further find from the evidence that the servants of the defendant, managing said train, had knowledge of such defect and in the absence of such knowledge, said servants, had the right to presume that he possessed the ordinary power of sight and hearing."

I. With all due respect to the learned circuit judge, we find ourselves unable to agree with him that this instruction was erroneous.

The plaintiff saw fit of his own motion to introduce

evidence tending to show his physical infirmities both in hearing and seeing. At first blush it might have appeared to the jury that these physical defects excused his failure to exercise ordinary care and prudence, but most clearly the law regards his conduct under the circumstances in a different light.

On the one hand, in the absence of knowledge of these defects in his hearing and eyesight, the trainmen had the right to suppose that neither his vision nor his hearing was impaired. *Maloy v. Railroad*, 84 Mo. 270; Beach on Contributory Neg., sec. 393. But, on the other, being conscious himself of his defective sense of hearing, so far from excusing his negligence in going between the rails of a railroad track and walking there, he was bound to exercise greater vigilance in looking for trains, and in this case this is peculiarly true, because the plaintiff testified he was an old railroad man, and hence fully understood the danger of walking between the rails. Of this principle there seems to be no doubt. *Purl v. Railroad*, 72 Mo. 168; *Tyler v. Sites' Adm'r*, 88 Va. 470; 2 Shear. and Red. on Neg., sec. 481; 2 Wood on Railroads [Minor's Ed. 1894,] pp. 1446, 1556; Booth, Str. R'y Law, sec. 386; Patterson's R'y Acc. Law, p. 75; Wharton on Neg. [2 Ed.], sec. 307; Whittaker's Smith on Neg., p. 403.

There being no question of plaintiff being a trespasser, the case was narrowed to the one proposition, whether defendant's engineer used ordinary care to prevent his engine from running upon and over plaintiff after discovering his peril, and as there was evidence tending to prove that he used all the means at his command to avert the injury as soon as he discovered plaintiff was not heeding his signals, it finally resolved itself into a question of fact as to the distance within which the train could have been stopped after discovering that he was not regarding the repeated whistling.

The jury having found for defendant, the plaintiff moved for a new trial on various grounds, but the circuit court sustained the motion for the sole reason that defendant's first instruction was error. As required by positive statute, section 2241, Revised Statutes, 1889, the court specified of record the ground upon which it granted the new trial, and by section 2246, Revised Statutes, 1889, as amended by an act approved April 18, 1891, the defendant was permitted to appeal from this order granting the new trial.

In the case of *Millar v. Madison Car Company*, decided at this term and reported 31 S. W. Rep. 574, we had occasion to construe the foregoing sections, and reached the conclusion that when a motion for new trial is sustained and the grounds for setting aside the verdict are specified in the order on the record, the party appealing from that order has the burden only of showing that the court erred upon the grounds set out in its order, and was under no obligation to establish error which he had not asserted, nor to defend the court in advance against another's exceptions to its rulings until they were formulated in the manner allowed by law, and that he had a right to rely upon the presumption in favor of their correctness in the absence of a showing by his adversary that the motion was properly sustained on other grounds in the motion.

In that case, as in this, it was urged that the circuit court could grant a new trial of its own motion and that this court had sustained it in so doing in cases in which it had not specified the grounds upon which the new trial was awarded. But we endeavored to show in that case that the purpose of the statute was to require the court to specify the errors which in its opinion it had committed and securing to the party whose verdict was set aside, the right of appeal from that order, and where the court in obedience to this statute

does specify certain grounds, we are not then at liberty to indulge the presumption that it granted the new trial on other and different grounds. Upon more mature reflection we are convinced that we reached a proper construction of these statutes.

In addition to what was said in the *Millar* case, 31 S. W. Rep. 574, we may add that it is elemental in appellate practice that this court will not reverse the trial court for errors not saved in a motion for new trial. If then a party desires this court to review the action of the trial court upon the grounds other than those in which the trial court concedes he has erred, it is his duty to point out some other ground in the motion upon which it ought to have been sustained.

The granting of an appeal from an order setting aside a verdict is an innovation in appellate practice and we must endeavor to effectuate the intention of the legislature and in our opinion this statute will fall short of its purpose if we are to indulge in the presumptions which obtained prior to its enactment and which do not at all consist with its express terms.

If the trial court assumes to set aside a verdict for any reason not contained in the motion, it is still its duty to specify that reason upon the record, but, whatever the grounds for its order, it was clearly the intention of the statute to give the right of appeal from its decision thereon and if in the opinion of the appellate court its reasons are insufficient the verdict must stand and the costs of another trial be avoided, in the absence of affirmative showing by the party in whose favor the new trial was granted that it was properly set aside on other grounds.

As the circuit court specified but one ground for disturbing this verdict and, in our opinion, it erred in so doing because the instruction was proper, and as there were no exceptions saved on the trial to evidence,

or the giving of instructions, no other. question is before us for review, and it results that the order granting a new trial must be reversed, and the record remanded with directions to enter judgment for defendant upon the verdict rendered. SHERWOOD and BURGESS, JJ., concur.