JOSEPH YAKUBINIS v. MISSOURI-KANSAS-TEXAS RAILROAD COMPANY, a Corporation, Appellant.—137 S. W. (2d) 504.

Court en Banc, March 5, 1940.

944

*Everett Paul Griffin* and *Carl S. Hoffman* for appellant.

*Mason & Flynn* and *William L. Mason, Jr.*, for respondent.

946

DOUGLAS, J.—This is the second appeal in a suit for personal injuries suffered by the plaintiff when struck by one of the defendant's trains. On the north bank of the Missouri River, about two miles east of Portland, there was a contractor's camp in connection with some work which was being done on the channel. Between two points where the bluffs jut out almost to the river a busy community was created. The tracks run close to the river's edge between the points of the bluffs and the bank. Coming from the east there is first a quarry where rock is dug and hauled to the river. Then on the river side there is a pile yard into which a spur track has been run from the main line. Where this spur switches from the main track there is a crossing from the pile yard over the main track, through a gate and into a meadow on the opposite side of the tracks. This meadow is used for parking automobiles by residents of the surrounding community who report daily for work, for baseball during the noon hour and for a gathering place at lunch time for those men not living on the boats. A refreshment stand also attracts persons to the meadow. Then farther along and tied up to the bank are several "quarter" boats where some of the men bunk. Leading from the gang plank is a well-worn path across the tracks to a stile over the fence

into the meadow. There is another path leading up to the tracks at the western point where the bluffs again approach the river closing in this community. The record is not in agreement as to the distance of this point west of the path across the tracks to the stile. Plaintiff's evidence puts it at fifty or sixty feet. There was evidence of usage along the track between the two points of the bluffs by the several hundred men who work in this space and by people constantly coming to the place for various reasons.

The plaintiff sat down on the rail where the path approached the right-of-way at this western point. He was awaiting the end of the lunch hour intending to go to the camp office on one of the boats and apply for a job. A train came along, he sprang from the rail, but not soon enough. He was hit and injured; so brings this suit. The facts are more fully set out in our previous opinion in 339 Mo. 1124, 100 S. W. (2d) 461.

That opinion settles the law of this case inasmuch as the issues and the evidence are substantially the same. Matters decided on one appeal will be considered settled on the second appeal in the same case. There are exceptions to this rule such as where a mistake of fact has been made or where the decision did not do justice to the parties. [Crossno v. Terminal Railroad Assn. et al., 333 Mo. 733, 62 S. W. (2d) 1092; Ducoulombier v. Thompson, 343 Mo. 991, 124 S. W. (2d) 1105.]

There is some question raised about the exact place where the respondent was hit but he indicated on the same exhibit used in the first trial the same spot where he was sitting just before he was struck. Also other testimony placed him at the same point where the path running northwestwardly from the gang plank joins the track. We find no material difference in the evidence of this trial and that presented in the first trial. On the first trial, following our decision in Eppstein v. Mo. Pac. Ry. Co., 197 Mo. 720, 94 S. W. 967, that notice of user is proved by paths and by gaps, stiles and gates appurtenant to paths and by the use of the track by visiting pedestrians and habituees, we found that sufficient evidence of user was submitted. In addition there was the positive evidence of defendant's trainmaster (as was also the case in the last trial) that he knew of the presence of men in the immediate vicinity of the accident. On the last trial the engineer testified also that he knew of the activity which had sprung up because of the quarry, the pile yard and the presence of the boats and the use of the meadow all between the two points where the bluffs projected to the river. We again rule that there was sufficient evidence to warrant submitting the question of user to the jury and that the demurrer to the evidence was properly overruled. In so ruling we reaffirm the decision in English v. Wabash Ry. Co., 341 Mo. 550, 108 S. W. (2d) 51, announced subsequent to the first appeal, that only to places of *limited extent,* as are used for access

to shops, mines, industries and work-camps, may the rule of waiver of the right to expect a clear track be applied. The fact alone that the respondent would have been a trespasser had it not been for such user does not excuse the appellant from its duty imposed by such user. This was expressly ruled in Angelo v. Baldwin, 343 Mo. 310, 121 S. W. (2d) 731. We find no error in the respondent's instruction as to user. It sufficiently requires the necessary facts to be found in order to establish user. If there is any ambiguity it is remedied by the appellant's instruction on the same subject.

The facts do not sustain the instruction offered by the appellant that the enginemen had a right to assume that the respondent, while on the track, would exercise reasonable care for his own safety. A similar instruction was refused in Clark v. Atchison, Topeka & Santa Fe Railway Co. et al., 319 Mo. 865, 6 S. W. (2d) 954, and we held its refusal in that case to be error. We said there that if the plaintiff saw or knew that the train was coming, he was not in a position of imminent peril. The fireman testified that the plaintiff was standing near the track and looking directly at the approaching train. If there was nothing in his actions to indicate the contrary, we decided that it might be assumed that an adult would not voluntarily place himself in a position of peril of which he was cognizant. But here we have a different situation. The respondent was oblivious of his peril, a fact which seems to be conceded as the appellant has him lying on the track instead of sitting on the rail. Clearly the trial court was correct in refusing the instruction. Appellant's charges against other instructions are not sustained.

At the time of his injury in February, 1932, the respondent was eighteen years old. He was well over six feet tall and weighed one hundred and ninety-five pounds, was active, vigorous and athletic. He had graduated from the Benton, Illinois high school where he had played football, baseball and basketball. Since his injury his entire right side has been affected with the hemiplegic type of paralysis—the jumpy, or spastic type. He had lain unconscious for thirteen days after being struck. One of the doctors gives this description of the effect of the paralysis: "When he is sitting he favors or arches his body with the convexity to the left and angles his body toward the right side. The right arm is extremely spastic and goes through a number of movements and gyrations that are beyond the control of his mind. The right arm twists constantly in an inward direction with the hand always turning towards the body as though he is trying to pass it between his body and his arm and his right wrist constantly overflexes itself, bends in, and the fingers are more or less rigid and assume an extremely fixed, that is, tight, fixed position. Any attempt to use the right arm is in a jerky movement only. He can accomplish certain movements with his right arm and hand only by deliberate tries and in a still way. He can never reach out

freely with the right arm and hand and take hold or localize objects in the distance; he can do it by finally getting at it and taking hold of big objects. However, his right hand cannot at any time hold small objects. Now, in walking, he walks with an unusual twist of the body characteristic of a right-sided paralytic. The body is forcibly twisted at the waist line and the right leg comes out very much characteristic of the German goose step; the knee comes up very high in a jerky fashion and to the outside; that is, toward the right, and the foot swings high and the toe turns in, and then this foot is jerked in a rapid jerky movement and the weight is borne then on the ball of the foot at the little toe side. His gait is spastic all the way through; and also in making these steps the neck goes through certain twists and gyrations. The right hand, in attempted movements or attempted co-ordinated movements, is extremely jerky; he can reach out and take hold of objects and he had a fairly good grip once he gets hold of that object; however, the arm will not stay in the position he directs it, but begins to twist in that inward position.'' This condition indicates that damage was done to the left side of the brain. It was described as permanent by the two doctors who testified. The appellant offered no medical testimony. In addition the respondent lost the little and ring finger and part of the palm of his left hand. The middle finger is limited in motion. A scar runs from the base of the hand and extends out to the first joint of the middle finger. In December, 1933, respondent went to work at a coal mine as a slate-picker, that is—picking out pieces of slate, sulphurous and impure coal as the coal passes on a belt. He is able to do this using only his left hand and describes it as an old man's job. At first he was paid $4 per day, but was later raised to $5. He worked during the mining seasons from 1934 to 1937, inclusive. The season runs from 125 to 162 days. When he started to get about after the accident, he could hardly walk because of the condition of his right side. He got a bicycle and finally was able to ride it. In 1936 he rode to Hot Springs, Arkansas, and back during the summer when the mine was shut down. He plays catch and occasionally goes swimming. The jury awarded him a verdict of $20,000. They had an opportunity to observe him. Ordinarily we should not substitute our judgment for that of the jury. On motion for new trial it was claimed that the damages were excessive but the judgment was not disturbed. The trial court also had observed the respondent and heard the testimony of the doctors. It is in a better position to determine whether the verdict is excessive. We are disposed to bow to its judgment, except for the unfortunate practice which we recognize has arisen in some of the circuits under which the trial judge declines to interfere with the amount of the verdict, no matter how excessive, on the ground that the appellate court will ultimately determine the matter. This practice should not be continued. We conclude that $15,000 will

950

fairly and reasonably compensate the respondent for his injuries. A judgment for such sum should be affirmed. For a discussion of the damages for a similar type of injury see Hoyt v. Metropolitan Street Railway Company, 73 App. Div. 249, 76 N. Y. Supp. 832.

If, within ten days from the filing of this opinion, the respondent will file here a *remittitur* in the sum of $5000, the judgment will be reversed and the cause remanded with directions that a new judgment be entered in favor of the respondent and against appellant in the sum of $15,000 with interest thereon at the rate of six per cent per annum from January 21, 1938, the date of the original judgment. Otherwise, the cause will be remanded for new trial because of the excessive verdict. It is so ordered. All concur.