Orville NEWMAN, Guardian of the Estate and Person of Terry Newman, a Minor, Respondent,

v.

ST. LOUIS–SAN FRANCISCO RAILWAY COMPANY, a Corporation, Appellant.

No. 49673.

Supreme Court of Missouri,
Division No. 2.

July 18, 1963.

**584**

James M. Reeves, Ward & Reeves, Caruthersville (Ernest D. Grinnell, Jr., Wm. Bruce Kopper, St. Louis, of counsel), for appellant.

Charles E. Gray, James W. Jeans, Gray & Jeans, St. Louis, Bradley & Noble, John W. Noble, Charles Cable, Kennett, for respondent.

BARRETT, Commissioner.

This is an appeal by the Frisco Railroad from a $225,000 verdict for personal injuries in favor of Terry Newman, age 11.

Before considering the merits of the appeal some preliminary observations are necessary to precisely point up the issues involved and to place in context the only questions raised by the railroad, the giving and refusal of certain instructions and whether the verdict is excessive. In view of these specifically raised questions it stands admitted (almost necessarily in view of the circumstances) for the purposes of this appeal that there was a breach of duty, that a negligently operated train ran over and injured Terry and that he was not guilty of contributory negligence. On the other hand, this was not a res ipsa loquitur case ("Res ipsa loquitur as ground for direction of verdict in favor of plaintiff." 153 A.L.R. 1134), the evidence was virtually all oral and for reasons inherent in the jury system (Schroeder v. Chicago & Alton R. Co., 108 Mo. 322, 327, 18 S.W. 1094, 1095, 18 L.R.A. 827, Terry was not entitled to a directed verdict thereby rendering immaterial any errors in the giving and refusal of instructions. It is only in the most exceptional instances, solemn admissions of counsel or a written stipulation of facts (Magoffin v. Missouri Pacific R. Co., 102 Mo. 540, 15 S.W. 76), that a plaintiff in a negligence action is entitled to a directed verdict. Fisher v. Williams, (Mo.) 327 S.W.2d 256, 259; Cluck v. Abe, 328 Mo. 81, 40 S.W.2d 558. And in this connection it must be noted that many of the cases cited by the parties have to do with the substantive rules of law, several of them automobile collision cases involving adults and contributory negligence or the humanitarian doctrine, and are therefore less than helpful. Furthermore, in view of the hundreds of cases involving railroads, including the numerous instances of children injured while playing, walking or sitting on railroad tracks, these cases are not particularly persuasive even in so far as they are purportedly cited as announcing general rules with respect to instructions. But if certain rules of substantive law are necessary to an understanding of the problems raised upon this appeal the following authorities, not cited by the parties, have been consulted thus placing in proper context the objections to instructions. "Railroad's duty to children walking longitudinally along railroad tracks or right of way." 31 A.L.R.2d 789; "Contributory negligence of children." 107 A.L.R. 4; "Failure of train employee to discover in time to avert accident that object seen on or near track is human being, as negligence." 70 A.L.R. 1116; "Duty and standard of care, with respect to contributory negligence, of person with physical handicap, such as impaired vision or hearing, approaching railroad crossing." 65 A.L.R.2d 703; and, "Contributory negligence of adult struck by train while walking or

standing beside railroad track." 63 A.L.R. 2d 1226.

In any event, in view of the railroad's tacit admissions with respect to liability only the barest statement of facts is required. Terry, a mentally retarded boy, also suffering epilepsy, lived with his parents about a mile and a half east of Senath. Their home is 187 feet from the Frisco's Leachville branch-line tracks and about 50 feet from a dirt road. On the afternoon of July 7, 1961, Terry was sitting on the east rail of the tracks, 20 to 25 feet beyond the dirt road crossing. His back was to the south, his feet extending between the rails and, according to the fireman, he was making "a slight movement. * * * Just a little bit of a weave forward and backward." About 1:55 o'clock the Frisco's Leachville twice-a-week local freight train, traveling north, ran over Terry as he sat on the rail. The speed of the train as it whistled at the "signal board" eight and a half poles (the poles are 172 to 182 feet apart) from the crossing was 25 miles an hour. There are photographs, precise measurements and detailed testimony as to distances, speeds, and all the circumstances, but here it is only necessary to say that while the engineer sounded the bell and whistle the fireman, when the train was "Around four and one-half poles or a little over, I guess" from the crossing, saw Terry sitting on the rail and yelled at the engineer and "told him there was a little boy up there on the railroad tracks." In response the engineer "started blowing the whistle in short blasts * * * and then he got a little air," but he did not make an emergency application of the brakes. When the train was 50, 55 or 60 feet away Terry, for the first time, "looked at us" but did not move or change position. The brakes were thrown into emergency, according to the fireman, when the locomotive was two and one-half to three poles from Terry. The train, consisting of the engine, four cars and a caboose, stopped with 16 feet of the caboose on the crossing. At a speed of 25 miles an hour it could have made an emergency stop in 132 to 160

feet. In these briefly noted circumstances the factual issues to be resolved by the jury were indeed very simple and the railroad's negligence and consequent liability all but undeniable. Jett v. Central Electric Ry. Co., 178 Mo. 664, 77 S.W. 738; Fiedler v. St. L. I. M. & S. Ry. Co., 107 Mo. 645, 18 S.W. 847; Chamberlain v. Missouri Pacific R. Co., 133 Mo. 587, 33 S.W. 437, 34 S.W. 842; Reardon v. Missouri Pacific R. Co., 114 Mo. 384, 21 S.W. 731. As the court said in another instance of a train running over a boy age 10, "if they see a child of tender years upon the track * * * they have no right to presume that he will get out of the way, but should act upon the belief that he might not, or would not, and they should, therefore, take means to stop the train." Riley v. Missouri Pacific Ry. Co., 68 Mo.App. 652, 661. It is in the context of this easily understood, simple factual situation that prejudicial error in the giving and refusal of instructions is to be determined.

The railroad's principal attack is directed at instruction 5, the plaintiff's main instruction. After setting forth the duty of the railroad *"after discovering Terry Newman sitting on the rail of the track"* (emphasis supplied of course), the instruction told the jury that if they found that "Terry was and remained seated upon the east rail of the railroad track and that as the defendant's locomotive approached from the south the defendant's engineer saw and continued to see Terry Newman seated upon the track and that as the locomotive approached and the plaintiff remained in such position, there arose a reasonable likelihood of harm to the plaintiff and danger to him, *and that thereafter* the defendant's engineer, by the exercise of ordinary care, could have stopped the locomotive and have avoided injury to the plaintiff but that he failed to do so, and if you find that in so failing defendant's engineer was negligent and if you further find that plaintiff sustained injuries as a direct result of such negligence" the verdict should be in his favor.

■ It is said as the first of four assignments directed against this instruction that

it is erroneous with respect to the engineer's duty to stop the train in that it omitted from its hypothesis certain other or additional matters shown by the plaintiff's evidence; to wit, that "Terry was mentally retarded, an epileptic, the rate of speed of the train, the location of the train when crossing signals were started, the location of the train when the object was seen on the track, where it was when it was discovered that there was a human being on the track, the sounding of alarm signals, the setting of the emergency brakes, the ability of the engineer to stop the train after the engineer saw Terry was not going to remove from the tracks." In the first place, except perhaps abstractly as to warning, in neither refused instructions B, C, D and E, nor for that matter in any other instruction, did the railroad offer an instruction including or concerning any of these evidentiary details, (Hooper v. Conrad, 364 Mo. 176, 260 S.W.2d 496), many of which were not essential in so far as the basic theory of this case is concerned. In the second place, of the twelve cases cited in support of this assignment of error the first nine are automobile collision cases, some having to do with "abstract statements" in instructions, one on omitting "blowout" (Kitchen v. Pratt, (Mo.App.) 324 S.W.2d 778), but of the cases "principally relied on" (Sup.Ct. Rule 83.05(a), V.A.M.R.), the first, fourth and fifth are not cited in the argument section of the appellant's brief and of course the purpose of their citation is unknown. The tenth case, also not cited in the argument, is a railroad case but there controverted facts essential to the plaintiff's theory of recovery were omitted from the principal instruction and that of course was prejudicially erroneous even in a F.E.L.A. case. Fitzpatrick v. St. Louis-San Francisco Ry. Co., Mo., 300 S.W.2d 490. The eleventh and twelfth cases are railroad cases and in many respects bear upon the substantive rules of law involved here but they are not concerned with instructions. It so happens, except for also including signals, that instruction one in Carrier v. Missouri Pacific Ry. Co., 175 Mo. 470, 478, 74 S.W. 1002, 1004, (the eleventh case), is almost identical with instruction 5 here. There was no evidence, however, that the train crew saw the deceased and in that case and in Maloy v. Wabash, St. L. & Pac. Ry. Co., 84 Mo. 270, adults, both hard of hearing and one "decrepit" at age 60, were held to be guilty of contributory negligence as a matter of law. The railroad offered no instruction as to Terry's retarded mental condition (compare Candee v. Kansas City & Independence R. Co., 130 Mo. 142, 31 S.W. 1029, Jackson v. Kansas City, Ft. S. & M. R. Co., 157 Mo. 621, 645, 58 S.W. 32, 39) and in contending that the court erred in refusing its instructions B, C, D and E inconsistently argues that "Neither does the fact that Terry was mentally retarded and an epileptic change the rule of law applicable." But, as indicated at the outset, this appeal is not concerned with the substantive law, including contributory negligence, and as to the railroad's first objection it is sufficient to say that the cases relied on do not demonstrate that instruction 5 is prejudicially erroneous.

The second and third objections to instruction 5, and essentially the same problem is involved in the railroad's refused instructions B, C, D and E, is the assertion that it imposed an absolute duty to stop the train on the first appearance of danger "without submitting to the jury that *the first duty of the engineer was to give warning signals* and it only thereafter became his duty to stop the train as it became apparent that Terry did not heed the signals." Or the third objection couched in this language "(t)he instruction failed to submit the right of the engineer to assume that sounding of alarm signals would be sufficient to cause Terry to move off the rail, and that the duty to stop the train would not arise until it became apparent that Terry was not going to heed the signals." Throughout its brief, for illustration in connection with refused instruction C, it is said that "if the engineer and fireman exercised ordinary care in giving a warning

to Terry and if after giving such warning it did not become apparent to the engineer and fireman that Terry was not going to heed said warning until such time as they were unable to bring the train to a stop before striking Terry, then the issues should be found for the defendant."

Again, the cases concerning adults and the substantive law, including the humanitarian doctrine, add nothing to the argument. In the first place there is no basis for the repeated assertion that in any and all instances of persons on its tracks the railroad has a right and has discharged its duty if it first signals by bell and whistle and thereafter it is too late to stop and no case cited by the railroad so holds. Furthermore, as indicated in connection with the substantive law, it was the theory and supported hypothesis of instruction 5 here that "The engineer in this case saw the plaintiff; warned him by a danger signal; saw him fall; says he thought he was drunk; and says he himself was cool, and not excited. Under such circumstances, the law did exact, as ordinary prudence, that he should use all means in his power, consistent with his own safety, and that of his train and passengers or crew, to prevent killing plaintiff. This much the instruction demanded, and no more, as we read it." Reardon v. Missouri Pacific Ry. Co., 114 Mo. 1. c. 404, 21 S.W. 1. c. 736; Annotation 31 A.L.R.2d 789, 799. As the same judge subsequently said for the court en banc, "The engineer is not required to stop his train if the trespasser is far enough away to warn him; and a timely warning is sufficient until it is seen that, for some cause, it is not heeded. *Then it is his duty to avoid killing, even a trespasser, if, by the exercise of ordinary care, it can be done.*" Chamberlain v. Missouri Pacific R. Co., 133 Mo. 587, 605, 33 S.W. 437, 34 S.W. 842.

■ It is not necessary to illustrate in further detail that refused instructions B, C, D and E were either incorrect statements of law or hypothesized a factual situation not supported by the record or not applicable as applied to the basic theory of this case. Even as to a young man 18 the court has said, "The facts do not sustain the instruction offered by the appellant that the enginemen had a right to assume that the respondent, while on the track, would exercise reasonable care for his own safety. * * * The respondent was oblivious of his peril, a fact which seems to be conceded as the appellant has him lying on the track instead of sitting on the rail. Clearly the trial court was correct in refusing the instruction." Yakubinis v. Missouri-Kansas-Texas R. Co., 345 Mo. 943, 948, 137 S.W.2d 504, 505–506. As to all of these particular assignments "The criticism upon the three instructions receives its strength from attacking them in detail." Reardon v. Missouri Pacific R. Co., supra. For the indicated reasons and in the circumstances of this record, instruction 5 was not prejudicially erroneous and the court did not err in refusing to give instructions B, C, D and E.

The court gave instruction 3, a conventional burden of proof instruction, and in addition the plaintiff offered and the court gave instruction 7, relating to the same subject: "With reference to the burden of proof being placed upon plaintiff, you are instructed that if you find in his favor by a preponderance of the greater weight of the credible evidence under instruction No. 5, then you are instructed that he has met and carried the burden of proof placed upon him." In the circumstances of this case "we cannot comprehend the purpose of plaintiff in asking" (Reardon v. Missouri Pacific R. Co., supra) this as well as other instructions. Nevertheless, the problem is whether the giving of the instruction was manifestly erroneous and prejudicial entitling the railroad to a new trial, that is whether it improperly shifted or placed the burden of proof, relieved the plaintiff of some essential burden or was ambiguous, confusing or misleading so as to misdirect the jury. Davis v. Kansas City Public Ser. Co., (Mo.) 233 S.W.2d 679, 681–682.

■ Citing only Knipp v. Mankin, (Mo.) 336 S.W.2d 371, the appellant contends that

instruction 7 "modified and diluted the burden of proof" required in instruction 3 and thereby was misleading and confused the jury. In the first place there are some very significant differences in language, purpose and effect in instruction 7 and instruction 4 in the Mankin case. An important distinction, one emphasized by the court, was that there the instruction said "if you believe and find from *the credible evidence in favor of plaintiff.*" There, as the court pointed out, the additional instruction in terms purported to explain the meaning of the other burden of proof instruction, in effect superseded it and eliminated it from consideration. Here instruction 7 does not refer to instruction 3 and does not purport to explain it—it merely says that if by the preponderance or greater weight of the evidence the jury finds in favor of plaintiff "under instruction 5," the principal instruction, he has met and carried his burden of proof. Furthermore, the burden of proof was not as a matter of fact an important issue in this case, it did not have the significance that it does in res ipsa loquitur. Williams v. St. Louis Public Ser. Co., 363 Mo. 625, 253 S.W.2d 97. The instruction here is not the "complement" (Lanasa v. Downey, (Mo.App.) 201 S.W.2d 179) of another instruction and it is not "the burden of proof in converse," (Venditti v. St. Louis Public Service Co., 362 Mo. 339, 240 S.W. 2d 921) as plaintiff's counsel may have had in mind when it was drafted. It is not claimed that it is an incorrect statement of law, it was cautionary and in some degree discretionary and the trial court has given consideration to its possible prejudicial effect. Davis v. Kansas City Public Ser. Co., supra. In several instances, most recently in Boll v. Spring Lake Park, Inc., (Mo.) 358 S.W.2d 859, it has been held that almost identical instructions were not prejudicially erroneous. Lanasa v. Downey, supra; Venditti v. St. Louis Public Service Co., supra; Williams v. St. Louis Public Service Co., supra; and Rasp v. Baumbach, (Mo.) 223 S.W.2d 472.

Instruction 6 told the jury that if the railroad was found negligent as submitted in instruction 5 "then the court instructs you that even if any conduct of plaintiff, or acts or omissions of his parents directly contributed to his own injuries, that would be no defense to the charge submitted to you in instruction 5." Again, as with instruction 7, in the circumstances of this case it is difficult to imagine what counsel had in mind and why they would hazard the giving of these entirely useless instructions. Fortunately for Terry, however, the problem again is whether the instruction is manifestly erroneous and prejudicially unfair to the appellant. In addition to the cases cited in its objections to instruction 5 the railroad relies on but two cases, the unique humanitarian doctrine case of Chastain v. Winton, 347 Mo. 1211, 152 S.W.2d 165, and the F.E.L.A. case, Berry v. St. Louis-San Francisco Ry. Co., 324 Mo. 775, 26 S.W.2d 988. Among other things it was held in the Chastain case that the defendant's withdrawal instructions of speed and lookout were prejudicially erroneous because they may have misled the jury into believing that they could not consider the taxicab's speed after Chastain came into a position of peril. In the Berry case it was held that there was no error in the court's refusal to give withdrawal instructions which would have been confusing because they "affect(s) an assignment of negligence properly submitted to the jury."

█ As stated in another connection, there is no claim here that Terry was guilty of contributory negligence, the railroad offered no instructions on the subject and it was not in fact an issue upon the trial of the cause. But more important, in view of the objection implied from the citation of the two cases, is the fact that instruction 6 does not specifically withdraw any conduct, it simply says that if the hypothesis of instruction 5 is found Terry's conduct or that of his parents is no defense. This instruction could be considered at length but in Kleinlein v. Foskin, 321 Mo. 887, 899, 13 S.W.2d 648, 653, there was a much

stronger direction, it was considered at length and the court held that the giving of the instruction was not reversibly erroneous: "We have given careful and thoughtful consideration to the several grounds of criticism laid against the plaintiff's instruction numbered 2, and we have reached the conclusion that no harm or prejudice was occasioned to appellant by the instruction, and that it is improbable that the jury could have been confused or misled thereby, and hence we hold that the giving thereof does not constitute reversible error in the instant case and upon the present record." (321 Mo. 1. c. 904, 13 S.W.2d 1. c. 656.

■ Instruction 10 concerns the measure of damages and there is an objection to its form, that "(1)arge bold faced type was used in drafting the instruction, as contrasted with ordinary type used in the verdict directing instruction No. 5 which unduly accentuated and emphasized the issue of damages over that of liability and magnified and unduly emphasized the amount of damages." The only case cited in support of this assignment is the second appeal of Fitzpatrick v. St. Louis-San Francisco Ry. Co., Mo., 327 S.W. 2d 801, 80 A.L.R.2d 825, and its dramatic but manifestly inflammatory episode of a blind man, with his cane, cigar box and guide, entering the courtroom and conferring with plaintiff's counsel near the close of a case in which the principal claim was the loss of an eye. Needless to say this episode is not comparable to the alleged prejudicial use of "large bold type" in a measure of damages instruction. As a factual matter the instruction does not mention the "amount of damages," and it is not readily apparent in this particular case how an instruction could "magnify" or "accentuate" damages over liability. Instructions 5 and 10 have been reproduced and obviously they are in different type, instruction 10 is in larger type, but to say that, as contrasted with "lightface type," it is "boldface type" (Webster's Third New International Dictionary) is another matter. No doubt the typing of instructions should be uniform

as far as possible and of course large contrasting type should not be purposefully employed in the measure of damages or any other instruction. But in this case and as to this particular objection deference is due the trial judge's undisputed explanation when he ruled on the motion for a new trial. "In reference to defendant's claimed error in reference to the difference in type as shown in instructions numbers 5 and 10, all of plaintiff's instructions were typed in the same print as instruction 10; however, certain corrections had to be made as to 4, 5 and 6. They were retyped by the Court Reporter who had no electric typewriter immediately available."

The other objections to instruction 10 are that it submitted five overlapping items of damage and erroneously submitted "the impairment of Terry's ability to work and labor in the future after he became 21 years of age, when there was no evidence touching his ability to work and labor at any time. The only evidence on the subject matter was to the effect that he was mentally retarded, an epileptic, had never gone to school and had never worked at any time prior to the injuries complained of." In neither form nor substance is the instruction comparable to instruction 7 in Westfall v. Mossinghoff, J. & Company, (Mo.) 345 S.W.2d 148, 152–153, and its five times repeated "and the ill effects, if any, which naturally and necessarily followed from such injuries." Even so, said the court, "We do not determine whether the giving of this instruction in itself constituted reversible error." The leading case relied on is Moss v. Mindlin's, Inc., (Mo.) 301 S.W.2d 761, and there the cases were again reviewed and an instruction similar to this one was criticized: "We should observe that we do not commend the use of detailed and complicated damage instructions in the usual personal injury case. * * * The use of shorter damage instructions would obviate questions such as here raised by defendant." But again, nevertheless, it was held that the instruction was not prejudicially erroneous. If this were the only point in-

**590**

volved upon the appeal it would be interesting to pursue the subject at length.

The essence of the railroad's complaint is to *"Third:* The impairment, if any, of plaintiff's ability to work and labor in the future after he reaches majority which directly resulted from said injuries, if any." In addition to the Moss and Westfall cases the appellant cites in support of this assignment Kelly v. Kansas City Public Service Co., (Mo.) 335 S.W.2d 159; Kelsey v. Kelsey, (Mo.App.) 329 S.W.2d 272, 273; Wolfe v. Kansas City, 334 Mo. 796, 68 S.W.2d 821, and Myers v. Karchmer, (Mo.) 313 S.W.2d 697 and Brooks v. Mock, (Mo.) 330 S.W.2d 759. In the two latter cases it was expressly held upon the authority of Moss v. Mindlin's, Inc., that similar instructions were not prejudicially erroneous. The only case in which an instruction on the subject of impaired ability to work and labor, or on earnings, has been held to be prejudicially erroneous is Seymour v. House, (Mo.) 305 S.W.2d 1. And there, unlike any other case, the instruction permitted consideration of "any earnings, if any, *heretofore* necessarily lost by plaintiff, and any impairment, if any, of plaintiff's ability to work and earn money *hereafter* as a direct result of such injuries." (Italics supplied.)

But all the above cases were concerned with adults and are therefore beside the point in this case. It is not necessary to re-examine the rationale of the doctrine, it is sufficient to say that the rules announced in those cases have no application to children. In all the cases in which injuries to children have been involved, similar, if not identical, instructions have been upheld without exception. "Nor is the instruction to be held erroneous upon the ground that in the absence of express evidence regarding actual wages and earnings which plaintiff might be expected to lose on account of his injury, it invited the jury to enter the field of speculation, surmise, and conjecture. In the case of injury to an adult, it is true that proof must be made from which the extent of the pecuniary loss may be estimated with reasonable certainty. But in the case of an infant, whose earning capacity is wholly untried, it is held that the question of his damage for the loss of future earning capacity is necessarily to be left to the sound judgment, experience, and conscience of the jury." Lanasa v. Downey, Mo.App., 201 S.W.2d 179, 185. In the horse-car railroad case of Rosenkranz v. Lindell Railway Co., 108 Mo. 9, 18 S.W. 890, the plaintiff, age 4, was seriously injured including, probably, traumatic epilepsy, and the damage instruction properly allowed recovery "(2) for any loss of earnings after he shall have attained the age·of 21 years." Wise v. St. Louis Transit Co., 198 Mo. 546, 560, 95 S.W. 898, 902, involved a boy 7 and, without proof, "any loss of the earnings of his labor after he shall have arrived at the age of 21 years." Ferrier v. Schoenberg Merc. Co., 158 Mo.App. 533, 138 S.W. 893, involved a boy 16 and Buckry-Ellis v. Missouri Pacific R. Co., 158 Mo.App. 499, 138 S.W. 912, involved a girl 7 and "loss of earnings after reaching the age of 18 years" even though there was not of course "proof that she had ever earned any income nor is there anything suggesting a criterion by which her earnings may be measured after she attains her majority."

And now finally there is the essentially meritorious and difficult problem of whether the $225,000 verdict is excessive. It is not necessary in meeting the problem to again cite a long list of cases and repeat the general rules. The practice of remittiturs rather than new trials was established at the behest of counsel for injured plaintiffs (Counts v. Thompson, 359 Mo. 485, 502, 222 S.W.2d 487, 495) and ever so often the court en banc, most recently in Moore v. Ready Mixed Concrete Company, Mo., 329 S.W.2d 14, re-examines and reasserts with all its attendant factors the rule of uniformity.

Terry was so seriously and permanently injured that it is not necessary to review the evidence in detail or to list such incidentals as the periods of hospitalization, treatment,

or even past and future pain and suffering, these are all obvious from a mere recital of his indisputable physical injuries. The train crushed off both legs below the knees, and subsequently it became necessary to surgically remove both legs above the knees. There was a four-inch laceration in the right occipital area, a small puncture wound over the right eye and minor cuts and bruises too numerous to mention. The tip of the right thumb was crushed off. There was a puncture wound three by four inches in the lower back and even after debridement this wound had not healed a year later. There was a linear fracture of the right ilium which angled into the hip joint and a "fracture of the inferior ramus." There is some overlapping in these latter fractures but they have healed and "there was almost solid union of the fracture line." There had been "a revision of both amputations," a further removal of bone in order that "flaps of skin" may be made to cover the wounds. It was hoped that Terry would be able to wear artificial legs but because of his retarded mentality, pain in the area of the fractured hip, and for other reasons he will be unable to employ prostheses and is confined to a wheel chair. He can feed himself but is unable to go to the bathroom alone or to perform many other personal needs and, of course, will always require considerable care. As his father says, "he can roll around in that wheel chair. That's about it."

The railroad offered no medical evidence and does not question the enumerated injuries, their seriousness and permanency. In addition to those injuries it was the opinion of one doctor that as a result of the train running over Terry his mental retardation has become much worse and the implication of his testimony, as well as that of his father and mother, is that the accident and injuries aggravated the epilepsy. Against this phase of the claim the railroad proved that Terry was injured by an automobile in 1955 and in a suit against the driver his parents claimed that the automobile accident had made his mental and epileptic condition permanent and worse. That suit was settled for $3,500.

In Myers v. Karchmer, supra, the plaintiff was 65 years old and, age aside, his injuries were more serious than Terry's and there it was held, after a trial court remittitur of $50,000, that a verdict of $100,000 was not excessive. Since then a $200,000 verdict to a man 31, reduced in the trial court to $150,000, for injuries probably not so extensive and serious as Terry's, was held not so excessive as to require further remittitur. Moore v. Ready Mixed Concrete Company, supra. Except for possible mental injuries and helplessness the injuries here are somewhat comparable to those in Counts v. Thompson, supra. But that case was decided in 1949, Myers v. Karchmer was decided in 1958 and the Moore case was approved by the court en banc in 1959. In short, considering all the factors involved in the remittitur doctrine and its standard of uniformity the $225,000 verdict in this case is excessive in the sum of $60,000. If, therefore, plaintiff will remit $60,000 within fifteen days, the judgment will be affirmed as of the date of its rendition for $165,000; otherwise the judgment will be reversed and the cause remanded for a new trial.

BOHLING, C., concurs in result.

STOCKARD, C., concurs.

PER CURIAM.

The foregoing opinion of BARRETT, C., is adopted as the opinion of the court with this exception, namely, that the court has determined that the remittitur should be $90,000; if therefore plaintiff will remit the sum of $90,000 within fifteen days from the date of the filing of this opinion, the judgment will be affirmed as of the date of its rendition for $135,000; otherwise the judgment will be reversed and the cause remanded for a new trial.

All of the Judges concur.