## Ralston v. Dossey (two cases).

Dec. 9, 1941.

Harlin & Harlin and Larimore & Craddock for appellant.

Dowling & Baird and Pleas Sanders for appellee.

OPINION OF THE COURT BY VAN SANT, COMMISSIONER—Affirming.

We will consider and dispose of both appeals in one opinion. The first is from a judgment in the sum of $6,500 rendered at the May 1940 term of the Hart circuit court for damages to appellee by reason of alleged negligence in the operation of an automobile owned by appellant and used and driven by his son Chester, who was 16 years of age at the time of the accident. The second is from a judgment rendered in the same court at its September 1940 term, sustaining a demurrer to, and dismissing, appellant Ralston's petition to have the judgment and verdict rendered in the first case set aside, because, while deliberating, the jury's attention was directed to matters which did not appear in evidence on trial of the case.

On the afternoon of October 1, 1931, Chester Ralston and his brother, Charles Ralston, were using an automobile owned by appellant and maintained by him for the use of the family. The boys had obtained permission of their father to use the car on this occasion. They invited Raymond Bales, Louis Hensley, and James Rogers to ride with them to Horse Cave, and as they were leaving Canmer, Morris Dossey joined the party. At a tourist camp known as the Wigwams they overtook a car driven by Leo Martin who was accompanied by his wife, his children, and a boy named William A. McKinney. Concluding to pass the Martin car, Chester drove close behind it and abruptly cut his wheels to the left, leaving the concrete pavement. In cutting his wheels to the right in an endeavor to get back on the concrete, as he was passing or after he had passed the Martins, the Ralston car turned over, severely injurying the Dossey boy. The Martin car was clearly on the right edge of the concrete at all times before and during the happening of the accident and was not touched by the Ralston car at any time. There is no dispute of the above facts and appellant states in his brief "all the way from home" Chester did not exceed the speed allowed by law and that at the place of the accident the road was "of ordinary width, smooth and straight" and no car, other than the Martin

car was in sight. Our review of the evidence confirms these statements except as to the speed of the car at the moment of attempting to pass the Martins.

Complaint is made (1) that the trial court erred in overruling defendant's motion for a directed verdict; (2) that instructions 1, 2, and 4 given by the trial court were erroneous and prejudicial to his substantial rights. We will discuss the contentions in the order named. We are not persuaded that counsel for appellant are serious in their first contention because the statement of facts contained in their brief (which were not controverted in brief of appellee) are such as to call for the application of the doctrine of res ipsa loquitur. The phrase res ipsa loquitur means "the thing speaks for itself." Paducah Traction Co. v. Baker, 130 Ky. 360, 368, 113 S. W. 449, 452, 18 L. R. A., N. S., 1185, and the doctrine is: Where a thing which causes an injury is shown to be under the control of the defendant, and the accident is such as in the ordinary course of events would not happen if those who had the control of it used the degree of care imposed upon them by law, the happening of the accident in itself affords reasonable evidence that the accident arose from want of care on defendant's part, unless it be shown by the defendant that the accident was attributable to some other cause. Paducah Traction Co. v. Baker, supra; Gilreath v. Blue & Gray Transportation Co., 269 Ky. 787, 108 S. W. (2d) 1002. There is no testimony in this case contradictory of the presumption of defendant's son's negligence and the admitted facts are inconsistent with the theory of the defendant that the plaintiff was guilty of contributory negligence. There is no intimation that the car was overturned by reason of some defect apparent or latent, nor was there any obstruction in the road to which the accident could be attributed. Up to the moment of attempting to pass the Martin car, Chester was driving at a reasonable rate of speed. Appellant admits that there was a width of 12 feet of concrete to the left of the Martin car over which to travel in passing the latter. This was ample space for a prudent and careful driver to pass the other car without leaving the paved portion of the road, and, either because of excessive speed, or because of failure to keep the car under control, or because of failure to maintain a lookout, the car was driven off the paved portion of the road and caused to overturn, resulting in plaintiff's injuries. In the absence of a showing of the intervention of some outside

agency, no reasonable person could conclude that the accident did not result from negligence of the driver and it is unnecessary to determine whether the act of negligence was excessive speed, his failure to keep the car under control, or his failure to maintain a lookout; certainly it was one of the three or a combination of all. Since there was neither evidence from which an inference could be drawn in contradiction of the facts imputing negligence to the driver of the Ralston car, nor evidence upon which to base a contributory negligence instruction, and since appellant admits in his brief the car was used and maintained for family purposes, appellee was entitled to a directed verdict in his favor to be returned under a proper instruction on the measure of damages. This conclusion disposes of the complaints in respect to the instructions except No. 4, defining the measure of damages, which reads:

> "If the jury find for the plaintiff as to his injuries, you should award him such sum in damages as you may believe from the evidence will fairly and reasonably compensate him for his physical and mental suffering, if any of either, which he has endured or it is reasonably certain he will hereafter endure; for the reasonable expense, if any, incurred for physician and doctor's bills, nurses' bills, hospital bills, medicine, ambulance fee and transportation fee, not exceeding $1500.00 for said expenses, and for any impairment of his power to earn money, if there was any, which you may believe from the evidence are the proximate results of his injury, not exceeding in all the sum of $26,500.00."

The complaint of this instruction is that the court permitted the jury to "assess damages for any impairment of his (plaintiff's) power to earn money" when there was no evidence as to either temporary or permanent power to earn money, and it is argued that the testimony as to permanent disability is shadowy and uncertain. Neither allegation nor proof of specific pecuniary loss of earning power is necessary to recovery. Permanent impairment of power to earn money is merely the test by which the jury must be guided in fixing the damages for permanent injuries, and, where permanent injuries are pleaded and shown, permanent impairment of power to earn money follows as a matter of course. Gretton v. Duncan, 238 Ky. 554, 38 S. W. (2d) 448. The

instruction given is substantially the same as those approved by this court in many cases where the evidence justified a finding of permanent injury. Stanley's Instructions to Juries, Section 3152, notes pages 387 to 389. Iseman v. Hayes, 242 Ky. 302, 45 S. W. (2d) 110, 85 A. L. R. 996. That being true, the instruction was not improper if the injuries complained of are permanent in their nature. The evidence as to the injuries is as follows: Dr. Wm. Wells, an eye, ear, nose, and throat specialist of Glasgow testified that he made four examinations of plaintiff's eyes and that he had "palpatis or inflammation of the optic nerves" as a result of traumatic injury and in answer to a hypothetical question, he stated that he was of the opinion that the condition was caused by the accident under discussion. He said that by reason of this condition there was a limit to the field of vision to the extent of 33 1/3rd percent in both eyes, and that, in his opinion, the condition was permanent. Dr. Clifton Follis, a physician and surgeon of Glasgow, stated that he saw the boy several hours after the accident and found him unconscious, in a very bad state of shock, pulse very poor, a bad cut across his forehead and top of his head, and "the boy looked like he was dead." That he thought it impossible at the time to save him; he had very serious injuries and a shake-up of the brain; he had a double fracture of the lower jaw bone in each jaw; the cut on the forehead was 4 or 5 inches long; and he had other minor injuries. He had to be fed by a tube into the stomach; the boy would frequently vomit and the nurse would then be required to cut the wires used to hold the jaws together to keep him from choking. There was a crumbling of the jaw bone and the teeth became loose, infection developed in the bone of the jaw, and some teeth had to be pulled to establish drainage. He had to be tied in bed to prevent his further injury and it was at least two weeks before he showed any signs of consciousness. Though he had gradually improved he was delirious at the time of his discharge from the hospital, two months after the happening of the accident. He said that ordinarily a person who remained in such condition for such period of time does not get well; that a severe shock to the brain would usually clear up in 72 hours, but that symptoms that remained as long as they remained in this case showed that there was a severe and traumatic break-up of the brain; that since removal from the hospital he had been disappointed because the

patient had not recovered as fast as he (the doctor) thought he would. He stated that the boy had a low pulse rate and that there was no doubt that it was caused by the brain injury. When asked as to the permanency of the injuries he gave the following answer:

"Ordinarily in six months the larger portion of them do. It has been about seven or eight months now, and ordinarily the improvement is noted in the first six months. The boy shows no improvement in the last two or three months on the face of it. To determine just what the disability will be is something I can't say, I don't think anybody can say. Disability coming from a brain injury is hard to say. I think he is sure to have some disability always, I don't know how you could get around that. His jaw teeth are gone, and when he chews his mouth does not come together right, and it is impossible for him to chew properly on one side. That can never be corrected, that is a permanent disability, and he had an infection in the bone on that side. These teeth that are gone can never be recovered. This bone that was infected could start up again, or rather an abscess at that old place of fracture. The other condition, and of course the most important one, is the brain injury, and of that condition I don't know and have no way of saying. It might be he would be better in a few months, and it is possible that he might have to have a brain operation on some bone to relieve it within his head in a years time, it is hard to say, nobody can tell that. His eyes of course have been examined, and from the symptoms he has some disability in his eyes. At present I don't know of any occupation that the boy is qualified to do that he could get and hold, I don't know of any work that he could hold down at present, but how long that will last, I don't know."

Dr. R. H. Burdette, a dentist of Glasgow, described the condition of the mouth, teeth, and jaws to be the same as that described by Dr. Follis; that the jaw is not in a normal condition, the teeth do not mesh as they formerly did, and the injuries are permanent. Dr. J. J. Moran testified that he examined the patient 6 months after the injuries, that the headaches, vertigo, and low pulse were, in his opinion, the result of a brain injury, and he believed the boy to be permanently affected. The

defendant introduced the written statement of Dr. W. P. Drake, the only expert introduced by him. It was agreed that the statement could be read as his evidence. He stated that he had examined the eyes of the boy and there was a 10 per cent impairment of the field of vision in one eye, none in the other, and there was no inflammation of the optic nerve.

There is no difference of opinion among the doctors as to the extent of any of the injuries except as to the eyes, and the conflict as to the eye injuries was not as to the permanency of the disability but solely as to the percentage thereof. All of the medical testimony is to the effect that the injuries are permanent, and such evidence, not being in the field of common knowledge, when uncontradicted by opinion, fact, or circumstance, must be accepted by us as conclusive of the point in question. Kingston-Pocahontas Coal Co. v. Maynard, 209 Ky. 431, 273 S. W. 34; Barrowman v. Prudential Insurance Co. of America, 266 Ky. 249, 98 S. W. (2d) 912; Consolidation Coal Co. v. Marcum's Adm'r, 289 Ky. 220, 158 S. W. (2d) 150. We therefore conclude that it was proper for the court to give the instruction for permanent injuries.

There remains for our determination complaint that the trial court erred in sustaining the demurrer to the petition in the second case. This action was brought under Section 344 of the Civil Code of Practice, which reads:

> "If grounds for a new trial be discovered after the term at which the verdict or decision is rendered, the application may be made by a petition filed with the clerk not later than the second term after the discovery—on which a summons shall issue, as on other petitions, requiring the adverse party to appear and answer it on or before the first day of the next term. The application shall stand for hearing at the term to which the summons is returned executed, and shall be summarily decided by the court. The evidence may be either by depositions or by witnesses examined in court. But no such application shall be made more than three years after final judgment was rendered; nor do the provisions of this section apply to divorce cases, so far as the judgment for divorce is concerned."

Appellant set out in his petition the affidavits of 5

jurors which recited that while deliberating on the verdict in the case on its trial in May, one of the jurors told the others that appellant had stated to his (the juror's) wife that appellant had accident insurance on his car to the amount of $10,000; that another juror stated that he had overheard a statement by some one that the defendant or his attorneys had offered to pay the plaintiff the sum of $5,000 in settlement of the case; and that another stated that he had overheard a conversation around the courthouse that Mr. Ralston had insurance on the car. The appellant further alleged that he did not receive the information contained in the affidavits until after adjournment of the May term of court.

The petition contains the following allegation:

"The matters complained of herein will be established on the trial of this cause, by the members of said jury and no other witnesses."

The court sustained the demurrer to the petition, and appellant declining to plead further, the petition was dismissed. Appellant admits that public policy forbids the examination of jurors to impeach the verdict of the jury but relies upon the distinction made by the Supreme Court of the United States in the case of Mattox v. United States, 146 U. S. 140, 13 S. Ct. 50, 36 L. Ed. 917, and other cases from foreign jurisdictions. In the Supreme Court case Mr. Justice Fuller writing for the court pointed out that it is contrary to public policy to establish by evidence of jurors the motives and influences which affected their deliberations either to impeach or support the verdict but held that a juryman may testify to any facts bearing on the question of the existence of any extraneous influence, although not as to how far that influence operated upon his mind. But we believe that the distinction in the cases cited, though they may be sound in other jurisdictions, are not applicable to the rule established in this state. Our courts have adopted in civil cases the rule mandatorily required by our Code in criminal cases, viz., "A juror can not be examined to establish a ground for a new trial, except it be to establish that the verdict was made by lot." Section 272, Criminal Code of Practice; Borderland Coal Co. v. Kerns, 171 Ky. 626, 188 S. W. 783, 785. This rule needs no explanation. It forbids the examination of jurors on any ground for any purpose in support of a motion or petition for a new trial except that the verdict was made

by lot. Tampering with jurors is zealously guarded against by fixed rules of procedure and evidence; and to permit a verdict to be overturned by affidavits of the jurors when they are no longer under the protection of the court might lead to very mischievous and pernicious operations on judicial procedure. That being true, the lower court properly sustained the demurrer to the petition which showed on its face that no evidence other than the testimony of the jurors would be introduced on the trial of the cause.

Wherefore the judgment in each case is affirmed.