PAUL PHILIP LESNIAK, AN INFANT ·BY HIS PARENTS AND GUARDIANS AD LITEM ZBIGNIEW LESNIAK AND BARBARA LESNIAK, AND ZBIGNIEW LESNIAK AND BARBARA LESNIAK, INDIVIDUALLY, PLAINTIFFS–APPELLANTS, v. COUNTY OF BERGEN, DEFENDANT–RESPONDENT.

Argued May 8, 1989—Decided September 21, 1989.

*Lewis Stein* argued the cause for appellants (*Nusbaum, Stein, Goldstein, Bronstein & Compeau,* attorneys).

*Richard J. Donohue* argued the cause for respondent (*Richard J. Donohue,* attorney; *Marc J. Friedman,* on the brief).

The opinion of the Court was delivered by

CLIFFORD, J.

Plaintiffs brought suit to recover for personal injuries sustained by the infant plaintiff when a tree branch fell on him in a park maintained by the Bergen County Park Commission. The trial court refused plaintiffs' request to charge the jurors that in assessing damages that might be awarded the infant plaintiff, they could consider his loss of income-earning capacity. On plaintiffs' appeal to the Appellate Division challenging the adequacy of the verdict, that court, by a divided vote, upheld the trial court's ruling in respect of the requested jury charge. The Appellate Division ruled largely on the strength of *Coll v. Sherry,* 29 *N.J.* 166 (1959), in which this Court declared that

> if the plaintiff introduces evidence showing there is a reasonable probability that his injuries will impair his future earning capacity, and sufficient factual matter upon which the *quantum* of diminishment can reasonably be determined, the jury may properly be instructed that it can consider this item in establishing damages. [*Id.* at 176.]

The majority below concluded that plaintiffs' proofs were insufficient to warrant the requested instruction under the *Coll* two-pronged standard. *Lesniak v. County of Bergen,* 219 *N.J.Super.* 468, 475–77 (1987). Moreover, the majority was of the view that in the case of an infant plaintiff, satisfaction of the *Coll* standard requires expert testimony of a "medical, economic or employment nature." *Id.* at 476. The dissenter below favored a more relaxed standard than that set forth in *Coll* when the injured plaintiff is an infant.

> Loss of earning capacity of an employed adult, considered in *Coll,* is susceptible to measurement by methods of projection more definite than can reasonably be applied in the case of an infant whose aptitudes, skills, capacity and inclinations have yet to meet worldly tests. [*Id.* at 478 (Landau, J.A.D., dissenting).]

The dissenting member of the Appellate Division panel concluded that the trial court erred in refusing to charge as plaintiffs had requested, and that the error could not be viewed as

harmless because the failure to give the requested instruction could have materially affected the quantum of damages. *Id.* at 479. Because of the dissent below, plaintiffs' appeal is here as of right. *R.* 2:2–1(a)(2). We reverse.

## I

Plaintiffs' complaint against defendant, County of Bergen, seeks damages under the Tort Claims Act, *N.J.S.A.* 59:1–1 to :12–3, for injuries sustained on September 21, 1980, by the infant plaintiff, Paul Lesniak, then age seven, in Dunkerhook Park, a County-maintained facility in Paramus. The infant's parents sue *per quod.* Reference henceforth in this opinion to "plaintiff" indicates the infant plaintiff, Paul. Plaintiff charges that the County was "palpably unreasonable" in its failure to guard against the reasonably foreseeable risk of the kind of injury he sustained when a limb fell from a tree and struck him.

Resolution of the issue on this appeal requires us to focus on the nature and extent of plaintiff's injuries. The tree limb, weighing about thirty pounds, fell nearly forty feet and crushed the left side of the infant's head while he was seated at a picnic table. Unconscious and bleeding, Paul was rushed to Valley Hospital in Ridgewood, where emergency surgery was performed that same day. In the emergency room, plaintiff's condition was considered to be a "neurosurgical emergency." X-ray photos revealed that the boy's skull was severely depressed and fractured on the left side. At the fracture points the skull bone had splintered, and bone was exposed through layers of the scalp. Shards of bone had been pushed three-quarters of an inch into the brain.

The hospital surgeon removed the bone fragments and evacuated an acute hematoma that had formed between the brain and skull. The surgeon also removed a quantity of damaged brain tissue from the left hemisphere, after which the skull was repaired and closed. Although the operation was successful, plaintiff's evidence at trial demonstrated that the accident and brain surgery left lasting impairment of Paul's mental and

motor functioning, and some psychological disability. Plaintiff argues that his proof on these residual defects warranted a specific jury charge on the loss of future-income-earning capacity.

Plaintiff's evidence dealing with the remedial defects was extensive and detailed. This opinion provides only a summary of the proof, to illustrate that his injuries left plaintiff with prolonged and lasting effects: permanent impairment of motor ability, permanent defect in mental or cognitive ability, and long-lasting psychological sequelae manifested by depression and emotional lability.

The accident's effects on plaintiff's motor ability were most prominently displayed in his lack of dexterity in the right hand and arm, his awkward gait, and his poor grip and deficiency in fine motor skills in using his right hand. These were accompanied by a shift from right-hand to left-hand dominance. Dr. Martin Diamond, who oversaw a course of physical and occupational therapy at Children's Specialized Hospital in Westfield, continued to monitor plaintiff's progress. He testified that throughout his evaluations his patient showed some improvement but displayed poor coordination and asymmetrical reflexes between his right and left sides, and often carried his arm and hand in a deformed, claw-shaped position.

Plaintiff also introduced the results of tests administered at the Columbia University Neurological Institute (Institute) two-and-one-half years after the accident. Dr. Rita Haggerty, a professor of psychology at the College of Physicians and Surgeons, testified that the testing

certainly suggests that certain technical areas will be difficult for him to do if he ever, if he ever has to do anything that involves manual dexterity or constructing things, he will be limited, be slower to do that.

In addition to the proof of loss of manual dexterity, plaintiff introduced evidence tending to show that the accident left him with permanent impairment of his mental functioning. At the Children's Specialized Hospital, an initial evaluation by the Speech & Hearing Department led to the conclusion that Paul

"presented a language disorder of auditory processing and word retrieval skills." Despite a six-week speech-therapy program at the Hospital that revealed progress, the discharge evaluation concluded that Paul was still behind his age level in activities calling for reasoning and judgment, and that his immediate auditory recall was poor. Although the results of standardized testing administered in all New Jersey public schools put plaintiff's performance in at least the average level, Dr. Haggerty and the Institute staff concluded that despite those indicia of normal intelligence, Paul suffered from deficits in memory, organization, and attention abilities. The fact that plaintiff performed reasonably well on standardized tests would not change her evaluation because those tests did not probe the same abilities. She commented:

> They don't necessarily assess the skills that one needs in everyday life or that one's going to need for the future in terms of being able to * * * organize information, being able to speak bluntly, being able to express one's ideas * * *.

> \* \* \* \* \* \* \* \*

> You know, information comes at you in a disorganized way. And, what you've got to do in your life and what he's going to have to do, is organize it. * * * And, that's the kind of things he can't do. And it's not the kind of thing that that test measures.

In Dr. Haggerty's opinion the lasting effects of the head injury were such that several years after the accident, plaintiff was "still showing a problem with retention," one that she considered "permanent":

> [T]hese are going to be continuing problems in the future; * * * he had problems in copying and writing and * * * these signs suggest that he would continue to have difficulties in writing and expressing his ideas orally as well as motor difficulties.

Dr. Marion Blank, a developmental psychologist and professor in the Psychiatry Department of the Albert Einstein College of Medicine, also evaluated plaintiff's mental abilities, in January 1984. She too concluded that the boy had lasting cognitive difficulties. Although Dr. Blank did not express the view that Paul's residuals were permanent, she did recommend cognitive therapy for two to four years. She felt that plaintiff's

actual functioning * * * [is] probably worse than his testing functioning. Because if you just take out a single skill, it will show up all right. But when you are actually reading, for example, a text or a book you have to do everything all at once; you have got to be able to organize which page you were at; you've got to be able to mark when you finish it so you can go back to it; you've got to be able to comprehend it and go to a dictionary if you don't understand it.

Those are the kinds of things he would really start falling down on because any normal activity requires you to do everything all at once.

The final testimony on Paul's cognitive abilities came from Dr. Jeffrey Mandell, a psychologist who worked with plaintiff in weekly sessions from November 1983 to December 1984. He testified that plaintiff had great difficulty perceiving a problem and developing options to solve it, and that he planned poorly and could not follow a line of reasoning. Although the doctor noticed that plaintiff was making slow improvement, he stated, "I don't feel that he'll ever return to full function cognitively, no."

In addition to the foregoing proof of injury affecting plaintiff's motor and cognitive abilities there was evidence that the accident and resulting condition had left Paul depressed and psychologically scarred. Dr. Haggerty concluded that Paul suffered from clinical depression, which she characterized as a common catastrophic reaction in left-hemisphere brain-injury cases, and from low self-esteem due to his perception of the loss of functioning. Although Dr. Haggerty did not state that either the depression or the emotional lability was permanent, she urgently recommended that the boy undergo psychotherapy to help sustain him through his depression and restore his self-image. A course of therapy with Dr. Mandell, the psychologist, apparently produced some improvement, inasmuch as plaintiff became more open and his personality was less blunted by the end of their sessions.

To counter all the foregoing, defendant introduced evidence through expert testimony, school records, and testimony concerning plaintiff's family life. The thrust of that evidence was that although Paul would always experience some "residual

disabilities" in his right-side motor functioning, whatever impairment of mental faculties had been demonstrated was traceable to causes other than the accident, as was the case with plaintiff's emotional difficulties. We need not recount the testimony in detail inasmuch as the question before us is not one of weight of the evidence; it is rather whether the proof was sufficient to warrant consideration by a jury of lost income-earning capacity as an element of damage.

Based on the evidence recited above, plaintiff requested that the jury be instructed specifically to consider loss of income-earning capacity. The request read:

> As an additional item of damages, you may consider the impact of the infant plaintiff[']s injuries on his future earning capacity, if any. In this regard you should keep in mind the instruction I previously gave you with respect to pain and suffering. Ther[e] is no precise yardstick for a child of these tender years but you should use your good judgment and experience.

The trial court refused to add this specific instruction to the general damage charge. Instead, the court charged:

> A plaintiff such as Paul Lesniak who is awarded a verdict is entitled to fair and reasonable compensation for any permanent or temporary injury resulting in disability to or impairment of his faculties, his health, or his ability to participate in activities as a result of a defendant's wrongdoing. Disability or impairment means worsening, weakening, or loss of faculties, health, or ability to participate in activities. You may consider physical and psychological disability and impairment. The measure of damages is what a reasonable man or woman would consider to be adequate and just under all of the circumstances of the case to compensate the plaintiff for his injury and his consequent disability or impairment, no more and no less.
>
> Now, you may consider the impact of the injury on Paul Lesniak's future capacity to function. If you find any disability is permanent, you should take into account Paul Lesniak's future ability to function physically and mentally, as any award you make must take into account the future disability as well as past and present disability.

The jury returned with a verdict of $150,000 for Paul and $20,000 for his parents. The trial court denied a motion for a new trial on the issue of damages.

In affirming the trial court's rejection of plaintiff's request to charge on loss of income-earning capacity, the Appellate Division, relying on the general principle that all damages must be proven with "reasonable certainty," held that "[p]laintiffs failed

to offer the requisite proofs" to permit the jury instruction. 219 *N.J.Super.* at 476. The majority below found plaintiff's motor impairment to be the only disability relevant to meeting the evidentiary burden, characterizing that proof as only "of a general nature." *Ibid.* As indicated above, the majority's view was that "satisfaction of the *Coll* standard would have required presenting testimony of a medical, economic or employment expert which specifically addressed and established those facts." *Ibid.* Although recognizing that this requirement of expert testimony is sometimes relaxed, the majority read *Coll* to exclude an income-earning-capacity charge from any such exception. *Ibid.* In his dissent Judge Landau expressed the view that a standard other than that found in *Coll v. Sherry* should apply when the plaintiff seeking to recover damages for lost earning capacity is an infant:

> In adult cases we should require more to establish loss of future earning capacity than in the case of an infant. * * * The probability of *some* loss should be sufficient to submit the issue to the jury.
>
> In this case, plaintiff has not argued that the jury should be permitted to infer loss of income merely from proof of the nature of the injury. Rather the medical experts have specifically addressed, in a general sense, the probable impact of the injury upon tasks requiring manual dexterity. The majority would require additional expert testimony to meet the quantification test imposed by *Coll.* While I would not preclude such expert testimony, it should not be mandatory in a case such as this. [*Id.* at 478 (citation omitted) (footnote omitted).]

## II

We begin with a statement of basic principles. A jury instruction that has no basis in the evidence is insupportable, as it tends to mislead the jury. *Guzzi v. Jersey Central Power & Light Co.,* 12 *N.J.* 251, 260 (1953); *Massotto v. Public Serv. Coordinated Transp.,* 58 *N.J.Super.* 436, 438–39 (App.Div. 1959). Moreover, there is no recovery allowed for the mere possible consequences of an injury inflicted by a tortfeasor. *See Mauro v. Raymark Indus., Inc.,* 116 *N.J.* 126 (1989). Rather, for suggested future results to be an included element of damage recovery, it must appear that the consequences are

"reasonably certain or reasonably probable to follow." *Budden v. Goldstein*, 43 *N.J.Super.* 340, 346 (App.Div.1957). As the *Budden* court declared:

> Basically, our view comes down to this: a consequence of an injury which is possible, which may possibly ensue, is a risk which the injured person must bear because the law cannot be administered so as to do reasonably efficient justice if conjecture and speculation are to be used as a measure of damages. On the other hand, a consequence which stands on the plane of reasonable probability, although it is not certain to occur, may be considered in the evaluation of the damage claim against the defendant. In this way, to the extent that men can achieve justice through general rules, a just balance of the warring interests is accomplished. [*Id.* at 347.]

–A–

The above-stated principle is captured in the first prong of the *Coll* test. Before a jury can consider loss of earning capacity, there must be evidence demonstrating a "reasonable probability that [plaintiff's] injuries will impair future earning capacity," *Coll, supra,* 29 *N.J.* at 176. This principle retains its force even in the case of an infant, and to this extent we agree with the Appellate Division majority that *Coll v. Sherry* can be applied in the case of an infant.

We disagree, however, with the majority's appraisal of plaintiff's evidence as insufficient under the first prong of *Coll.* That evidence tended to show that the accident had affected Paul in three different ways: he has difficulty with right-side motor control, especially with his right hand and fingers; he has trouble with word retention and retrieval; and he has experienced emotional lability typical of a left-side brain injury and psychological difficulties adjusting to his new disabilities. Although there is no testimony that the psychological problems that plaintiff was experiencing were permanent, Dr. Haggerty's testimony suggests that the motor-control problem is permanent and that Paul will have continuing difficulty performing general tasks that require manual dexterity. In addition, Dr. Blank and Dr. Haggerty testified that plaintiff's word-retrieval problems were likely to continue in the future and would

hinder the performance of basic yet complex mental tasks such as reading a book at any satisfactory level of comprehension.

The evidence concerning these two effects of the accident was not sharply focused on the inability to handle any particular, specifically-identified jobs. Nevertheless the rudimentary nature of the disabilities is such as to lead to the conclusion that in reasonable probability the accident has lessened to some extent plaintiff's earning potential—or so a jury could find. Diminished language and motor-skill capacities would affect the level of performance in almost any employment setting. In fact, a jury might well conclude that this plaintiff's lessened word-retrieval and comprehension abilities would be more a detriment to his future employability than would be his lack of right-hand fine motor skills.

We are of course mindful of defendant's evidence tending to show that the accident had minimal effects on plaintiff's mental and motor functioning. Moreover, we are aware that the injuries have had a somewhat subtle and spotty effect on Paul's ability to perform tasks. However, where as here plaintiff's experts have stated that the boy has permanent injuries to mental and motor functioning that impair his ability to do work involving manual dexterity or reading a book, the "reasonable probability" standard has been met and the question of impairment of earning capacity becomes one for the jury under a proper instruction.

This holding does not represent a major departure from current New Jersey law. Early cases on loss of future earning capacity show that "reasonable probability" exists when there is a permanent or lasting injury that would obviously impair the ability to earn. In *Kasiski v. Central Jersey Power & Light Co.*, 4 *N.J.Misc.* 130, 132 (Sup.Ct.1926), the two important fingers on an infant plaintiff's right hand were "rendered absolutely useless" and his hand was "sixty to seventy-five per cent impaired in usefulness," through play with a dangling high-voltage wire. From the severe nature of the injury the

jury was permitted to infer a loss of future income-earning capacity without testimony directly linking the permanent loss to the capacity to earn:

> Apart from the pain and anguish that the lad suffered from the painful injuries and from the limited use of his hand, the jury could properly take into consideration in estimating his damages * * * that his deformed and injured hand will in a great measure limit his choice of a vocation, and as a consequence diminish his earning power * * *. [*Id.* at 132–33.]

In *Lanio v. Steneck*, 9 *N.J.Misc.* 866, 867–68 (Sup.Ct.1931), a twelve-year-old boy had a fifty-five percent loss of use of his right leg. The court permitted a jury charge on loss of future earning capacity, even though plaintiff presented no testimony to link the general loss of functioning to an impaired ability to earn.

In *Rhinesmith v. Erie Railroad Co.*, 76 *N.J.L.* 783 (E. & A.1908), plaintiff suffered a neck-area disfigurement when a torpedo exploded on a train car parked near the station platform. *Id.* at 784. The court found no error in an instruction that permitted the jury to consider loss of income-earning capacity and specifically to take into account plaintiff's ambition to become an "operatic singer," *id.* at 785, given the fact that although plaintiff was employed as a school teacher at the time of the accident, "she had been taking voice lessons." *Ibid.*

A chief postal inspector injured his arm in a train collision in *Simmons v. Pennsylvania Railroad Co.*, 1 *N.J.Misc.* 571 (Sup. Ct.1923). After the wreck, the inspector could write but only with difficulty. On appeal defendant claimed that the postal officer's arm had recovered to the point that there was no impairment of his ability to perform his job. The court stated, "The seriousness of the injuries sustained, and the fact that the plaintiff was at the time of the trial still suffering from the results of the injury, makes it probable that there will be in the future a loss of earning power." *Id.* at 572.

The case of *Pushcart v. New York Shipbuilding Co.*, 85 *N.J.L.* 525 (Sup.Ct.1914), involved a workman who sustained a serious injury to his legs while using a defective tool. The

court upheld the trial court's instruction to consider the impairment of earning capacity, stating: "[A]n inference may be drawn that he will never again be able to engage in any work which requires the use of his legs * * *. We think that the extent of the injury resulting from the blow was properly submitted by the trial court to the jury." *Id.* at 527.

In *Yocus v. Lehigh Valley Railroad Co.*, 13 *N.J.Misc.* 85 (Sup.Ct.1935), plaintiff was hit with a steel beam. The fact that Yocus had changed jobs was enough to allow a loss-of-income-earning-capacity instruction. The court stated, "It is said that there was no proof of impairment of earning capacity. The change of employment and other proved facts, we think, made the question one for the jury to determine." *Id.* at 87.

To be sure, there are reported cases in which despite proof of permanent injury the evidence is insufficient to establish more than a "mere possibility," as distinguished from a "reasonable probability," of impairment of income-earning capacity. In *Marty v. Erie Railroad Co.*, 62 *N.J.Super.* 458 (App.Div.1960), relied on by the majority below, plaintiff was a twenty-three-year-old railroad brakeman who injured his skull falling from a moving rail car. *Id.* at 460. In contrast to the severe injuries testified to in the case before us, the brakeman sustained only a one-and-one-half inch cut on the right side of his skull, with no displacement of bone and no depression of his skull. *Id.* at 467. Four weeks after the accident he returned to his job with the railroad. At trial, plaintiff's medical expert testified that there "*may* be certain microscopic areas of scarring in the brain tissue." *Id.* at 468. However, on cross-examination the expert conceded that "the disability may not be as limiting as to prevent plaintiff from doing all aspects of his work." *Ibid.* The Appellate Division set aside a $22,500 verdict as excessive, in part because there was no "competent proof that plaintiff is or will be deprived of the full use of his faculties." *Id.* at 469. In contrast, we are satisfied that the testimony concerning the permanent impairment of Paul Lesniak's right-side dexterity and his mental capability demonstrate a reasonable probability

that his future earning capacity will be impaired, thereby warranting consideration of that claim by a jury.

As in *Marty, supra,* 62 *N.J.Super.* 458, the evidence in *Kress v. City of Newark,* 8 *N.J.* 562 (1952), showed only a possible loss of earning capacity. There the forty-one-year-old plaintiff developed skin cancer on her hands while employed as an X-ray technician at a Newark hospital. *Id.* at 565. The Court set aside a $90,000 verdict because plaintiff could not demonstrate how the cancer would affect her capacity to use her hands. The Court discerned

> no competent proof that the plaintiff is or will be deprived of the full use of her hands although, of course, there is some evidence of scars due to the operations. No satisfactory prognosis was offered by plaintiff's medical witnesses. [*Id.* at 575–76.]

Again, the facts are readily distinguishable from the case at hand. The plaintiff in *Kress* showed no more permanent injury than just a " 'little warty-like lesion' * * * that would bear watching." *Id.* at 576.

–B–

Having concluded that plaintiff presented sufficient evidence to demonstrate a reasonable probability that his injuries would impair his future earning capacity, we turn to the second prong of the *Coll v. Sherry* test, namely, the requirement of proof from which "the *quantum* of diminishment can reasonably be determined." *Coll, supra,* 29 *N.J.* at 176. Plaintiff here submitted no evidence on the basis of which the jury could make a dollar-and-cents calculation of the loss. The majority below determined that that evidential deficiency was fatal to the requested instruction on loss of future earning capacity. 219 *N.J.Super.* at 476. Although the majority below was rightly concerned with a jury's unguarded speculation on the question of diminishment of an infant's ability to earn, we hold the second prong of the *Coll v. Sherry* standard inapplicable in cases involving infants. We agree with the dissenter below that the case of an infant plaintiff calls for a more relaxed standard than that enunciated in *Coll.*

At the outset we point out that *Coll v. Sherry* can hardly be viewed as the last word on lost-earning-capacity proof, particularly in respect of an infant plaintiff. In *Coll* the plaintiff was an adult engaged in his own business as a purveyor of chicken and eggs, when his truck was rammed from behind during a routine poultry-delivery run. Although plaintiff received moderate neck and back injuries, he took no time off from work. While wearing a leather neck brace, Coll continued to ply his trade. When the jury returned a verdict of only $1,500, of which $1100 represented damages for personal injuries and pain and suffering, Coll appealed several issues concerning the damage award. It was against that factual background that this Court announced the two-pronged standard, under which a plaintiff must show both a reasonable probability that an injury will affect the ability to earn and also facts establishing the *quantum* of the loss when future earning capacity has been impaired. Because the case was going back for retrial on damages on account of trial error on the question of plaintiff's need for further surgery, this Court deferred ruling on the lost-earning-capacity issue, being content instead with simply stating the pertinent standard of proof.

We recognize a plaintiff's obligation to furnish the jury with "some evidentiary and logical basis for calculating or at least, rationally estimating a compensatory award." *Huddell v. Levin*, 537 *F.*2d 726, 743–44 (3d Cir.1976). At the same time we must keep in mind the need to balance the risk of jury speculation against a general tort-law goal of full compensation for an injured plaintiff. In cases involving injured infants, in which there is always going to be limited evidence, if any at all, permitting a concrete calculation of future earnings, our courts have allowed juries to determine the loss without requiring evidence that would permit its specific quantification.

In *Lanio v. Steneck, supra,* 9 *N.J.Misc.* 866, plaintiff proved that the twelve-year-old boy had a fifty-five percent loss of the use of his right leg but submitted no evidence to quantify the amount of earning capacity lost. The court declared:

It is said that there [were] no data upon which future disability could be measured in dollars and cents. There rarely [are] in such cases. It must of necessity rest much in obscurity, but this is not a valid reason for not permitting a jury to place a value on the loss. [*Id.* at 868.]

Similarly, in *Kasiski v. Central Jersey Power & Light Co.,* *supra,* 4 *N.J.Misc.* 130, the court permitted a jury to consider lost income-earning capacity where a boy severely injured his hand, even in the absence of evidence quantifying the extent of the impairment.

Plaintiff calls our attention to wrongful-death and loss-of-services cases in which evidentiary standards were relaxed in respect of proof of damages after injury to or death of a child. Those cases do indeed furnish an analogy, albeit not a complete one. In *Green v. Bittner,* 85 *N.J.* 1 (1980), this Court expanded the theretofore traditional elements of recovery, when parents sue for the wrongful death of their child, beyond the "loss of the value of the child's anticipated help with household chores, or the loss of anticipated direct financial contributions by the child after he or she becomes a wage earner." *Id.* at 4. Under *Green* the parents may recover as well for the "loss of their child's companionship as they grow older, when it may be most needed and valuable, as well as the advice and guidance that often accompanies it." *Ibid.* The Court said:

Given the speculative quality of the inferences, it might be further questioned whether one could realistically attach an estimated pecuniary value to such services. Our answer is, even assuming no special circumstances are proven, that the nature of these cases has led our courts to allow damages even though the inferences, and estimate of damages, are based on uncertainties. [*Id.* at 15–17.]

Before *Green* our courts allowed juries in wrongful-death cases to infer both the likelihood of the infant decedent's future contributions and the amount of those contributions in cases involving a child with special abilities. *E.g., Gluckauf v. Pine Lake Beach Club, Inc.,* 78 *N.J.Super.* 8 (App.Div.1963) (proof that child came from educated family and did well in high school supported inference that he would probably become microbiologist and contribute much to his mother during her declining years). Although the wrongful-death recovery is of

course not the same as recovery for lost income-earning capacity, both require some forecasting of what income the injured child would have enjoyed in the future. It would create an incongruous result to require an injured infant plaintiff to produce specific evidence on loss of future-income-earning capacity when parents do not have to produce such evidence to be entitled to a share of the future income that is lost when the child does not survive the injuries.

New Jersey courts also allow a relaxed standard when a parent claims damages for the loss of a child's services. When it can be inferred that a child's ability to be of service to a parent is diminished, a court will submit the damage question to the jury. There need not be evidence linking the injury to the loss of service, and the quantification of the damage amount is left to the jury. *Simmel v. New Jersey Coop Co.*, 28 *N.J.* 1 (1958). This Court adopted the Appellate Division's statement of the rule as follows:

> Clearly the trial judge should not send the issue to the jury merely because the child has suffered a permanent injury. However, where because of the permanent injury, the judge is of the view that reasonable men could find that probably there will be some resultant loss of services, then even in the absence of proofs showing the nature of the services lost or the extent of that loss and indeed in the absence of testimony that there probably would be some loss, he must submit the issue to the jury. The jury [is] allowed to rely upon common experience. [*Id.* at 15 (quoting *Simmel v. N.J. Coop Co.*, 47 *N.J.Super.* 509, 518 (App.Div.1957).]

In *Simmel* the infant's father's claim for loss of services was predicated on proof only of the extent of burn damage on his four-year-old son's leg. *See also Fabiano v. Berckes*, 1 *N.J. Misc.* 406 (Sup.Ct.1923) (upholding mother's *per quod* claim on ground that she was entitled to her injured son's earnings until the boy turned twenty-one or was emancipated; injuries were fractured thigh and lacerated ear).

 Plaintiff contends, on the basis of the above-cited wrongful-death and loss-of-services cases, that New Jersey courts have entrusted speculative future-income-earning matters to juries, because "common sense and experience have taught men

of ordinary experience to evaluate the various elements." We accept the argument, albeit in a somewhat less-expansive form than that in which it is offered. We now hold that if the evidence is such that a jury could conclude that an infant plaintiff has suffered a severe injury with lasting or permanent effects and the injury will within a reasonable probability impair the child's ability to earn, specific proof tending to quantify the lost-future-earning capacity is not a prerequisite to recovery for that element of damage.

With today's holding we join other jurisdictions that allow a jury to consider loss of income-earning capacity without quantification evidence in cases involving an injured infant plaintiff. *See, e.g., Shepard v. General Motors Corp.*, 423 *F.*2d 406 (1st Cir.1970) (applies New Hampshire law); *Pierce v. New York Central R.R. Co.*, 409 *F.*2d 1392 (6th Cir.1969) (eight-year-old lost foot in sledding accident; case turns on Michigan law); *Gleeson v. Wood*, 321 *F.Supp.* 118 (E.D.Pa.1970) (seventeen-year-old injured foot while running through glass door); *Collins v. Shelley*, 514 *So.*2d 1358 (Ala.1987) (seventeen-year-old injured in auto accident); *North Broward Hosp. Dist. v. Johnson*, 538 *So.*2d 871 (Fla.Dist.Ct.App.1988) (brain-damaged infant); *Wolczek v. Public Serv. Co.*, 342 *Ill.* 482, 174 *N.E.* 577 (1930) (eleven-year-old lost arm after touching high voltage wire); *Bernesak v. Catholic Bishop of Chicago*, 87 *Ill.App.*3d 681, 42 *Ill.Dec.* 672, 409 *N.E.*2d 287 (1980) (infant fractured hip in school yard); *Ralston v. Dossey*, 289 *Ky.* 40, 157 *S.W.*2d 739 (1941) (adolescent severely injured in car accident); *Roberts v. Tardif*, 417 *A.*2d 444 (Me.1980) (baby born with limp left arm); *Newman v. St. Louis–San Francisco Ry. Co.*, 369 *S.W.*2d 583 (Mo.1963) (child lost both legs when run over by train); *Chirnside v. Lincoln Tel. & Tel.*, 224 *Neb.* 784, 401 *N.W.*2d 489 (1987) (eight-year-old hit by truck); *Campolo v. City of Yonkers*, 137 *A.D.*2d 480, 524 *N.Y.S.*2d 229 (1988) (although speculative, enough evidence to warrant loss-of-earning-capacity charge on minor's injury); *Holder v. Petty*, 267 *Or.* 94, 514 *P.*2d 1105 (1973) (six-year-old hit by auto); *Glomb v. Glomb*, 366 *Pa.Su-*

*per.* 206, 530 *A.*2d 1362 (1987) (infant lost language and motor skills after being beaten by baby-sitter); *Christy v. Darr,* 78 *Pa.Commw.* 354, 467 *A.*2d 1362 (1983) (college student struck on head by campus police officer); *Tri–State Motor Transit Co. v. Nicar,* 765 *S.W.*2d 486 (Tex.Ct.App.1989) (proof that unemployed seventeen-year-old sustained permanent injury and would require future surgery sufficient to support jury charge on loss of income-earning capacity); *Felde v. Kohnke,* 50 *Wis.*2d 168, 184 *N.W.*2d 433 (1971) (sixteen-year-old sustained head and back injuries in head-on collision); *cf., e.g., Stang v. Caragianis,* 243 *Kan.* 249, 757 *P.*2d 279 (1988) (scar injury to face alone cannot be basis for lost-earning-capacity charge where twenty-five-year-old housewife presented no expert testimony demonstrating likelihood of future modeling career); *Morris v. Francisco,* 238 *Kan.* 71, 708 *P.*2d 498 (1985) (no expert testimony to distinguish past and present earning capacity of twenty-five-year-old cerebral-palsy victim); *Powell v. Montgomery,* 27 *Ohio App.*2d 112, 272 *N.E.*2d 906 (1971) (auto-factory worker submitted no evidence on how arm injury would affect performance of his job; lost-future-income-earning-capacity charge erroneously given).

We recognize the sharp split of authority on the question, see, *e.g., Buckley v. Exxon Corp.,* 399 *So.*2d 1225 (La.App.1981) (no lost-earning-capacity recovery for seven-year-old who presented expert testimony only on permanence of leg injuries), but we agree with the reasoning of such cases as *Newman v. St. Louis–San Francisco Railway Co., supra,* 369 *S.W.*2d at 590, in which the court stated:

> "[I]n the case of an infant, whose earning capacity is wholly untried, it is held that the question of his damage for the loss of future earning capacity is necessarily to be left to the sound judgment, experience and conscience of the jury." [Citation omitted.]

–C–

■ Finally, we address the requirement of the majority below that an infant plaintiff submit expert testimony to sup-

port a claim for loss of income-earning capacity. Although the value of expert testimony as an aid in establishing first, a link between an injury and the ability to earn, and second, the *quantum* of diminishment, in most cases cannot be gainsaid, we will not require expert testimony in all cases involving a minor. Such a requirement would be inconsistent with the law on expert testimony.

Expert testimony is essential when "the matter to be dealt with is so esoteric that jurors of common judgment and experience cannot form a valid judgment * * *." *Butler v. Acme Markets, Inc.*, 89 *N.J.* 270, 283 (1982). For example, the need for such testimony frequently comes into play in cases involving professional competence, such as medical malpractice, see, *e.g., Rosenberg v. Cahill*, 99 *N.J.* 318 (1985), or in the engineering field, see, *e.g., Shutka v. Pennsylvania Railroad Co.*, 74 *N.J.Super.* 381 (App.Div.), certif. denied, 38 *N.J.* 183 (1962), or in cases involving catastrophic explosions or the like, see, *e.g., Guzzi v. Jersey Central Power & Light Co., supra*, 12 *N.J.* 251. However, even in medical-malpractice cases, expert testimony is not required when facts showing a breach of defendant's duty are within "common knowledge" of a juror. *Klimko v. Rose*, 84 *N.J.* 496 (1980) (chiropractor continued neck treatment after patient became dizzy, sweaty, and grey); *Sanzari v. Rosenfeld*, 34 *N.J.* 128 (1961) (dentist caused patient's death by administering anesthesia without taking history of hypertension).

■ Proof of lost income-earning capacity contains one element that ordinarily must be established by expert testimony, namely, the severe nature and lasting extent of the injury. *See, e.g., Clifford v. Opdyke*, 156 *N.J.Super.* 208 (App.Div.1978) (prognosis of injury and probable permanent disability must, with rare exceptions such as amputation of body member, be established by expert medical opinion). But beyond that we perceive no absolute need, in the case of an infant plaintiff, for

expert assistance in determining how a given disability would affect job performance.

The information required to establish a link between the injury to an infant plaintiff and impairment of the capacity to earn an income must of necessity be of only a general nature, because it is impossible to determine what job a child will eventually take. The problem of establishing a child's earning impairment is different from that of proving an employed adult's impaired ability to perform a specific job. Consider the case of a diamond cutter or other artisan who has suffered a small eye injury. The earning-impairment analysis for such a case might require expert testimony under *Butler v. Acme Markets, Inc., supra,* 89 *N.J.* 270. For those craftsmen, a minor eye injury might affect job performance in ways so subtle or esoteric that a jury might need expert testimony to appreciate how the plaintiff's job performance has been impaired. The analysis for children cannot be so particular; it can be undertaken only in terms of general employability. Thus, although expert-opinion evidence could surely be an effective aid, it should not be required to link the injury to the ability to earn income.

Further, we will not require expert testimony, as a general rule, to establish the *quantum* of earning-capacity loss for a minor. Again, the subject matter of the proof is not so beyond common experience or the store of knowledge or ordinary people that jurors cannot arrive at a reasonable figure on their own. Moreover, we do not perceive much difference between expert prognostication and jury speculation when the question goes to loss of future earning capacity of a child. There are just too many variables to permit the kind of close calculation that would call for expert testimony. Although we are mindful of the fact that the assessment of an infant's lost income-earning capacity is burdened with the element of speculation, we nevertheless conclude that the question is not so beyond the

common knowledge and common experience of jurors as to warrant our making expert testimony mandatory in such cases.

### III

To summarize our holding, we have determined that when recovery is sought for impairment of an infant plaintiff's future income-earning capacity, the jury should be permitted to consider that element of damage when the evidence demonstrates a permanent or lasting injury of the kind that renders it reasonably probable, rather than merely possible, that the capacity to earn a living will be affected. When that reasonable probability has been established, evidence quantifying the amount of the lost income is not a prerequisite to recovery in the case of an infant. The severe nature and lasting extent of that class of injury must be established by expert medical testimony in all but the most obvious cases, *e.g.*, traumatic amputation; but expert testimony is not required either to connect the permanent injury with loss of ability to work or to quantify the diminishment of earning capacity.

Because the appeal raises issues only of damages and there is no attack on the judgment of liability against defendant, there need be a new trial only on damages. Although the request to charge submitted at the original trial, see *supra* at 17–20, was sufficient to alert the trial court to the need to instruct the jury on loss of future income-earning capacity, it was by no means a model to follow in the retrial. We are confident that with the aid of this opinion the trial court will be able to frame an appropriate instruction.

Judgment reversed, cause remanded.

*For reversal and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*For affirmance*—None.