62 N.J. Super. 458 (1960)
163 A.2d 167
JAMES MARTY, PLAINTIFF-RESPONDENT,
v.
ERIE RAILROAD COMPANY, A CORPORATION, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued May 23, 1960.
Decided July 12, 1960.
*460 Before Judges GOLDMANN, CONFORD and FREUND.
Mr. James J. Langan argued the cause for appellant (Messrs. Lamb, Langan & Blake, attorneys).
Mr. Seymour Margulies argued the cause for respondent (Mr. Frank V. Golden, attorney; Messrs. Levy, Lemken & Margulies, of counsel; Mr. Margulies, on the brief).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Defendant, a common carrier engaged in interstate commerce, appeals from a $22,500 judgment entered in plaintiff's favor in an action he had brought under the Federal Employers' Liability Act (45 U.S.C.A., § 51 et seq.) to recover damages for injuries suffered while in the railroad's employ.
Plaintiff claimed that while performing his duties as brakeman on the evening of December 1, 1957 he was seriously injured as a result of being thrown from a freight car on which he was riding when it was switched onto a wrong track and collided with a car standing there. Defendant denied negligence and pleaded contributory negligence in mitigation of damages, pursuant to 45 U.S.C.A., § 53. It contended that plaintiff had jumped from the car before it stopped.
At the close of plaintiff's case defendant rested without presenting any testimony. Plaintiff then moved for a directed verdict, claiming there was no controversy as to how the accident happened. Defendant insisted there was, but the trial judge granted the motion. He ruled there was no factual question presented as to defendant's negligence, and also ruled out contributory negligence. The result was that the case went to the jury on the question of damages *461 only. It returned a $22,500 verdict for plaintiff by a vote of 10-2.
Defendant at once moved for an order setting aside or reducing the verdict because it was excessive. After hearing argument the trial judge said:
"Gentlemen, the Court is not inclined to change jury verdicts. It is elemental the only grounds upon which a verdict can be changed by a Court is not because he thinks the verdict should be different than rendered by the jury. This motion is a motion to set aside the verdict on the ground it is excessive. Under the rules and the cases, verdicts can only be set aside, generally, where it is found the jury reached that verdict either by reason of passion, prejudice, mistake or partiality.
This plaintiff had a fractured skull. He is 23 years old. No one can foretell what that fracture might result in in his future life; but I am constrained to do this:
I will reduce the verdict to $15,000.00 if the defendant will pay. Otherwise, I will let the verdict stand at $22,500.00. If the defendant will pay the $15,000.00 and the plaintiff will not take $15,000.00, then I will set it aside as to damages only."
Plaintiff's attorney immediately agreed to accept the reduced sum. Defendant asked for time to consider the matter and later informed the court it would not agree to paying $15,000. The trial judge thereupon entered an order denying defendant's motion. Defendant's appeal "from the whole of the judgment entered" followed.
The facts are these: At the time of the accident plaintiff brakeman was riding a coal hopper car down an incline in defendant's Croxton classification yard. Trains coming in from the road are pushed by engine up the south side of a "hump." As each car reaches the top it is cut off and a brakeman rides it down the other side by gravity, the car being switched by employees onto one of 50 tracks. A yardmaster designates the particular track where the car is to go, transmitting his orders to the brakeman through a conductor, the man who cuts the car off the train at the top of the hump.
Plaintiff claims that at 7:45 on the evening in question he was instructed to ride a 70-ton hopper car onto track 3 *462 of the classification yard. When the car had been pushed up the hump he tested the brake, which was operated by a wheel at the top of the rear of the car. Below the wheel is an iron platform where the brakeman stands; alongside it and to the left is an iron ladder, the bottom rung being at a level with the floor of the car. Immediately around the corner and on the side of the car is another ladder, the lowest rung being only a step above the ground.
After plaintiff had tested the brake and found it in good working order, he signaled for the engine to move the car over the top of the hump. As this was done, the car was cut off from the rest of the train behind it and proceeded down into the yard at about 20-25 miles an hour. Plaintiff testified that as he started down the grade the brake was in partially applied position. The distance to the bottom of the incline is about ten car lengths, or 400-500 feet. Track 6 is located at the bottom of the incline, and track 3 about five car-lengths past the track 6 switch. The classification yard was lighted. Plaintiff found himself going onto track 6 instead of track 3, and then saw a stationary car ahead of him, about 120 feet from where his car had been switched onto track 6. He said that at that moment he was standing with one foot on the platform and the other on the rung alongside.
Plaintiff further testified that when he realized his car was on track 6 he tried to take up the slack in the brake but found he could not stop the car. At the same time, he said, "I was trying to move around from one ladder to the other [on the side] until I could jump or climb down, whichever I had a chance to do." The ladder on the side of the car would have allowed him to get closer to the ground and jump off. However, there was a collision and he was knocked off the car.
Plaintiff claims he hurt his head and back. He was taken to a hospital where he was confined for six days, after which time the company doctor cared for him about a month. From July to October 1958 he was treated by *463 his own doctor, Dr. Levitov, who prescribed pills for his headaches and applied heat treatments to his back. At the time of trial in October 1959 plaintiff complained that he still had severe headaches once or twice a week; his back hurt him, particularly at night; and he vomited "maybe once every three weeks or a month." In all, he lost some 60 days' work in the 22 months intervening between the accident and the trial, including the four weeks before he returned to work at the end of 1957.
Defendant's first contention is that the court erred in striking the defense of contributory negligence. The Federal Employers' Liability Act, 45 U.S.C.A., § 51 et seq., originally passed in 1908, abolished the defense of negligence of a fellow servant and substituted comparative negligence for contributory negligence. Assumption of risk was abolished as a defense in 1939. 53 Stat. 1404; 45 U.S.C.A., § 54. Section 3 of the act, now 45 U.S.C.A., § 53, provides:
"In all actions hereafter brought against any such common carrier by railroad under or by virtue of any of the provisions of this chapter to recover damages for personal injuries to an employee, or where such injuries have resulted in his death, the fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee: * * *"
unless the accident occurred because of the employer's violation of a safety statute  not the case here.
Although plaintiff had testified that he had been knocked off the car by the force of the collision, vigorous cross-examination developed the following:
"Q. You didn't jump? A. No, sir.
Q. You are sure? A. The only thing, I was trying to come around from the stand and the ladder on the west end of the car to get on the side of the car to come down, when the cars hit.
Q. You didn't jump? A. You could call it between a jump and getting knocked off, if you wanted to.
*464 Q. Which was it? That makes a difference. A. Well, I was coming down the ladder so I could get down, when the cars hit." (Italics ours.)
More significant on the question of whether plaintiff jumped or was knocked off the car is what appears in the hospital record. Plaintiff's attending physician was Dr. Moriarity. The history taken by another physician when plaintiff was admitted to the hospital states, under "Present Complaint," that "Patient white male admitted to hospital in ambulance complaining of laceration in the head produced when he jumped from box car to avoid crashed [sic] by another car." Essentially the same entry was made by that doctor in the "Summary" section of the "Physical Examination" sheets. Dr. Moriarity almost immediately referred his patient to Dr. Winokur to report on possible brain injury. Dr. Winokur's findings, based on an examination he made the morning of December 3, 1957 and set out at length in the "Consultation Sheet" of the hospital record, include the following: "History from pt.  on 12-1-57 he jumped off a moving coal car  struck mid-frontal  no unconsc.  Laceration  got up and then passed out for 5 min.  Complained of headache & dizziness." Dr. Winokur's examination revealed a "3 cm. laceration mid-frontal behind hairline  Alert. Oriented. Exam. Neg." X-rays showed a linear fracture of the right temporal area.
Turning to Dr. Moriarity's own "Progress Notes" in the hospital record, there appears under date of December 1, 1957, the day of the accident, the following:
"Man jumped from moving box car to avoid fetch-up with another car. Sustained 2" laceration of frontal scalp 2" above hairline. Was not unconscious. No other apparent injuries."
The entry was signed by Dr. Moriarity.
Plaintiff's attorney offered the hospital records at the close of his client's testimony, and they were admitted without objection. The court suggested that both counsel "go over them carefully to see if there is anything in there that should *465 be excised." At the close of the entire case plaintiff sought to excise all references to his having jumped off a moving car. The motion was denied.
Plaintiff insists that he should have been allowed to excind these references. We find the trial judge's ruling correct. There can be no question that the statements came from plaintiff himself. They were admissions, and so properly allowed in evidence. Defendant was entitled to the benefit of what plaintiff had told his treating physician and the examining physicians at the hospital, as well as Dr. Winokur, about having jumped off the moving car. The hearsay rule is not a ground of objection, as would be the case were plaintiff's assertions offered in support of his position. See 4 Wigmore on Evidence (3d ed. 1940), § 1048, p. 2 et seq.; Sandford v. The Chanaz Co., 117 N.J.L. 485, 489-490 (E. & A. 1937). But cf. Greenfarb v. Arre, 62 N.J. Super. 420, 163 A.2d 173 (App. Div. 1960), as to statements by a patient to a physician germane to diagnosis or treatment.
From what appeared in the hospital record, and plaintiff's testimony that "you could call it between a jump and getting knocked off, if you wanted to," there was sufficient to raise a question of fact as to whether plaintiff jumped off the train. The next question presented is whether, if plaintiff did jump from the train, a jury could find this to be contributory negligence under the attendant circumstances, so as to mitigate damages. Under the Federal Employers' Liability Act the issue of negligence, as well as plaintiff's contributory negligence, is one for a jury to determine. Wilkerson v. McCarthy, 336 U.S. 53, 61 et seq., 69 S.Ct. 413, 93 L.Ed. 497 (1949), quoting the familiar principle found in Tiller v. Atlantic Coast Line R. Co., 318 U.S. 54, 67, 63 S.Ct. 444, 87 L.Ed. 610 (1942), that "Where the facts are in dispute, and the evidence in relation to them is that from which fair-minded men may draw different inferences, the case should go to the jury."
Contributory negligence is not a term that classifies conduct in the abstract. Hickman v. Dutch Treat Restaurant, Inc., *466 3 N.J. 460, 465 (1950), quoted with approval in Seipel v. Sevek, 29 N.J. 593, 597 (1959):
"* * * Negligence is relative and not absolute, depending upon the requirements of due care in the particular circumstances; and whether there was such want of care for one's safety as to constitute a contributing proximate cause of one's injury is generally for obvious reasons a question for the jury."
Only in the clearest case, where the hypothesis of contributory fault is not fairly admissible, does the question become one of law for determination by the court. Battaglia v. Norton, 16 N.J. 171, 179 (1954). Otherwise it is of the very essence of the jury's function to select from among conflicting inferences and conclusions that which it considers most reasonable. It can choose any reasonable hypothesis  and this is as true of a defendant's negligence as it is of a plaintiff's contributory negligence. Schulz v. Pennsylvania R.R. Co., 350 U.S. 523, 526, 76 S.Ct. 608, 100 L.Ed. 668 (1956); Daulton v. Southern Pacific Co., 237 F.2d 710, 713 (9 Cir. 1956).
And see Annotation, "Contributory negligence of railroad employee in jumping from moving train or car to avoid collision or other injury," 58 A.L.R.2d 1232 (1958), which notes that in common law actions the majority of courts hold that whether the employee was guilty of contributory negligence in jumping to avoid an apparently impending collision with another train or car is for the jury to determine (at page 1244 et seq.), and that the same general rule applies in actions under the Federal Employers' Liability Act (at page 1254 et seq.).
We cannot say from all the proofs that the speed with which plaintiff had to make his decision as to jumping, or the comparative risk of staying on the car or jumping, were such as to have rendered the alternative of jumping one of undebatable prudence. We conclude that the jury should have been allowed to determine whether, assuming it found that plaintiff jumped from the car, he behaved as an ordinary prudent person would under all the circumstances *467 then present and so could not be held to have acted in a negligent manner. The case will therefore have to be sent back for retrial.
Some observation should be made about the size of the verdict. Although the trial judge was "not inclined" to change the verdict on defendant's motion to set aside or reduce it as excessive, and perhaps was simply attempting to bring about a post-trial settlement, we are impressed by the fact that he did suggest as large a reduction as $7,500, one-third the amount of the award. He said he would reduce the verdict to $15,000 "if the defendant will pay"; otherwise he would let the verdict stand. Parenthetically, we observe that this is not the right way to frame a proposed remittitur. If the trial court regards the verdict as sufficiently excessive to warrant reduction, it should in such case state that unless plaintiff is willing to take the suggested reduced amount, the verdict will be set aside as to damages. The order should not be made contingent upon defendant's willingness to pay the reduced amount.
We turn to plaintiff's injuries and complaints. He suffered a laceration of the frontal scalp, with a 3 1/2 cm. (less than 1 1/2") linear fracture of the right temporal bone. The laceration was repaired. X-rays showed no evidence of bone displacement or depression; the fall had resulted in no more than a hairline crack. The neurological examination was negative for intracranial trauma. If we take plaintiff's subjective complaints as true, he suffers no more than occasional headaches and dizziness. His hospital stay was brief. He returned to his work as brakeman four weeks after the accident, and also to the part-time job he pursued during off-hours. He consulted no doctor from the beginning of January until July 1958 when he first saw Dr. Levitov, who treated him until October 1958.
Although plaintiff testified to having pains in the back, the testimony of Dr. Silvera, his expert witness, was that X-rays he had taken showed that any abnormality of the back was congenital and had nothing to do with the accident. *468 There was no claim made for an aggravation of this back condition. Any testimony as to plaintiff's back should therefore have been disregarded. However, the trial judge in his charge to the jury on several occasions mentioned plaintiff's testimony regarding a back injury and that it still bothered him.
As for the head injury, Dr. Levitov's diagnosis was that plaintiff had "residuals of a brain concussion secondary to the injury to his head." His prognosis was "guarded" because "I could not give a definite answer at the time I last saw him." On direct examination he said he "felt" plaintiff had sustained a permanent disability in the form of a post-cerebral concussive syndrone, and ventured the opinion that plaintiff would be incapacitated as far as working ability was concerned. His complaints would continue indefinitely. Dr. Levitov explained what happened when plaintiff suffered his fracture: there was a swelling and bruising of the dura and brain tissue  "what we call a concussion of the brain." Subsequently, he said, "as this heals, there may be certain microscopic areas of scarring in the brain tissue" (italics ours), producing symptoms consistent with the weekly headaches and bouts of dizziness.
Asked on cross-examination whether it would make any difference in his opinion that plaintiff had a permanent disability and could not do his work, if he knew that plaintiff had returned to work on December 28, 1957 and had continued doing the same job as before and at greater salary, Dr. Levitov replied, "If that is so, I would say that the disability may not be as limiting as to prevent him from doing all aspects of his work."
Plaintiff's damages totalled $1,285  $1,200 representing a maximum of wages lost (the 60 days total absence from work included some weekends when he would not have been working) and an $85 doctor's bill.
From our study of the entire record, and particularly the nature of plaintiff's injury and complaints, we are persuaded that the verdict must be set aside. It is not merely *469 that we consider it excessive; we are convinced it was the result of mistake, partiality or prejudice. R.R. 1:5-3(a); 2:5. We have already commented upon the trial judge's references in his charge to plaintiff's claim that he injured his back and was suffering pain as a result. He also mentioned the fractured skull. That the judge was much impressed by the latter injury is reflected in the remark he made in denying defendant's motion to set the verdict aside: "This plaintiff had a fractured skull. He is 23 years old. No one can foretell what that fracture might result in in his future life." The fact is, there is no evidence anywhere in the case of the probability of plaintiff's condition becoming worse.
In admeasuring damages there can be no recovery for possible future consequences of an injury; they must be "reasonably probable to follow." Budden v. Goldstein, 43 N.J. Super. 340, 346 (App. Div. 1957). See also Botta v. Brunner, 26 N.J. 82, 90 (1958). The rule as most recently stated in Coll v. Sherry, 29 N.J. 166, 175 (1959), is that "if the prospective consequences may, in reasonable probability, be expected to flow from the past harm, plaintiff is entitled to be indemnified for them."
As in Kress v. Newark, 8 N.J. 562, 575-6 (1952), there was no competent proof that plaintiff is or will be deprived of the full use of his faculties, and no satisfactory prognosis was offered by plaintiff's medical witnesses. The jury was undoubtedly led to sheer speculation because of the connotation which testimony relating to a skull fracture carries for the average layman. The trial judge obviously was so affected, as appears from his remarks just quoted.
The amount of the verdict, when compared with the actual out-of-pocket losses and the testimony as to plaintiff's not too serious head injury and his subjective complaints, clearly indicates that the jury was improperly motivated in reaching the verdict it did, and that the trial court abused its discretion in not granting a new trial.
The judgment must be reversed and a new trial held.