706 A.2d 242

JOHN D. DOMBROSKI, MARILYN DOMBROSKI, H/W, PLAIN-
TIFFS–RESPONDENTS/CROSS–APPELLANTS, v. CITY OF AT-
LANTIC CITY, DEFENDANT–APPELLANT/CROSS–RESPON-
DENT, AND FREDERICK V. MAXSON, LION CORPORATION,
INC., DEFENDANTS.

Superior Court of New Jersey
Appellate Division

Argued January 21, 1998—Decided February 23, 1998.

460

Before Judges LONG, KLEINER and KIMMELMAN.

*Daniel A. Griffith* argued the cause for appellant/cross-respondent (*Marshall, Dennehey, Warner, Coleman & Goggin,* attorneys; *Richard L. Goldstein,* of counsel and on the brief).

*Paul R. D'Amato* argued the cause for respondents/cross-appellants.

The opinion of the court was delivered by

LONG, P.J.A.D.

On July 28, 1993, plaintiffs John and Marilyn Dombroski filed this negligence action as a result of injuries sustained when plaintiff, John Dombroski was struck by a bus while crossing an intersection in Atlantic City. His wife sued *per quod.*[1]  Defendants are Frederick V. Maxson, the driver of the bus; Lion Corporation, Inc., Maxson's employer; and the City of Atlantic City. Plaintiffs charged Maxson and Lion Corporation, Inc. with the negligent ownership, operation and control of the bus as well as negligent hiring.  Atlantic City was charged with improper design and negligent maintenance of the crosswalk.

Atlantic City filed an answer denying the allegations of the complaint, asserting several defenses, and seeking contribution and indemnification from the other defendants.  Maxson and Lion Corporation, Inc. subsequently settled with plaintiff for two million dollars.

The case against Atlantic City was tried before Judge Michael W. Winkelstein and a jury on March 18, 1996.  The following facts were established at trial:  On August 5, 1991, plaintiff was visiting

---

[1] Reference to plaintiff or the singular Dombroski is to John Dombroski.

Atlantic City. He was dropped off by a bus at the Atlantic City Bus Terminal and then walked from the terminal to the intersection of Atlantic Avenue and Missouri Avenue. He started to cross Atlantic Avenue on the green light. At this intersection there is a diagonal crosswalk that leads from the corner where plaintiff was standing to the opposite corner. In crossing, plaintiff walked to the left of the diagonal crosswalk. He was approximately halfway across when the bus operated by Maxson, which was turning left onto Atlantic Avenue, struck him.[2] The bus rolled over plaintiff's legs and ankles. After plaintiff twice yelled to the bus driver, the bus backed off his legs. Plaintiff never lost consciousness.

Five physicians testified on behalf of plaintiff at the first trial. Dr. John Esterhai, an orthopedic surgeon treated plaintiff for the injuries he sustained from the accident which were a fractured left shoulder, right tibia and left ankle. Esterhai testified that: 1) plaintiff has to restrict walking as much as possible, and if walking for longer than ten minutes he must use a wheelchair; 2) plaintiff is at risk for further injury because of the injuries to his lower extremities; 3) plaintiff experienced "severe physical pain" associated with the crush injury to his leg, the acute fracture to his shoulder and the damage to his ankle; 4) plaintiff continues to have pain as he is unable to move his upper left extremity and continues to have pain in his ankle; and 5) plaintiff has "permanent partial physical impairments."

Dr. Seth Braunstein, a physician at the Hospital of the University of Pennsylvania, testified that: 1) he has treated plaintiff for diabetes since 1982, but this condition was under control; 2) the injuries plaintiff sustained in the accident aggravated his diabetic condition since he is unable to exercise, resulting in weight gain; 3) there is a "high probability" that sometime in his life plaintiff will require an amputation of his left lower extremity; 4) had the accident not occurred it is "very unlikely that he would require

---

[2] Liability issues are not being contested, therefore only a cursory description of the accident is provided.

amputation of his lower extremity;" and 5) prior to the accident plaintiff was an upbeat active individual but now is more introverted, less outgoing and less joyful.

Dr. Lloyd Brotman, a psychologist, testified that: 1) he first saw plaintiff three years after the accident; 2) plaintiff had become depressed, had gained weight because he was unable to exercise and had difficulty sleeping; 3) plaintiff was experiencing an "adjustment disorder with a depressed mood;" and 4) plaintiff had undergone the process of psychosocial acceleration.[3]

Dr. David Sagransky, a specialist in internal medicine and rheumatology evaluated plaintiff two times after the accident and testified that: 1) plaintiff suffered severe damage to three of his four extremities since only his right arm was uninjured; 2) plaintiff was in constant pain and will always be in pain; 3) plaintiff has limited mobility of his left arm which is a permanent condition; 4) plaintiff's left ankle joint has been destroyed due to an infection leaving it permanently inflamed; 5) plaintiff's right ankle and knee are arthritic; and 6) plaintiff should be restricted to a wheelchair because the weight bearing on his knees and feet will wear out his joints.

Dr. Frederick Nahas, a general and vascular surgeon, discussed all the medical procedures plaintiff underwent during his hospitalization. Nahas testified that: 1) plaintiff's liver and spleen were repaired; 2) a fasciotomy was performed on his right leg to remove dead muscle tissue; and 3) skin grafts were performed. Nahas also testified that there is a reduced blood flow to plaintiff's legs which is associated with crush injuries to the lower extremities and that plaintiff is "quite likely" to undergo an amputation. In total, plaintiff was hospitalized 58 days.

---

[3] This process occurs when one goes from being a "40–year–old, to having a capacity to function of maybe someone in their 70's or 80's ... needing to use a wheelchair, needing help to get around, being unable to function in the manner that you did earlier." It's like "[waking] up one day and 30 or 40 years were added to your life."

The effect of the accident on plaintiff's life was also established at trial. Prior to the accident, he was an active individual who enjoyed playing the guitar, hiking and other outdoor activities, and overall had an active social and work life. Since the accident he is more introverted, less outgoing and less joyful. Not only is he unable to use his left arm effectively, he must wear a brace to support his ankle, use a cane to help him walk and utilize a wheelchair if he is to walk longer than ten minutes.

Plaintiff's wife testified as to her loss. She and plaintiff used to take martial art classes, hike and walk the beaches together. Since her husband no longer can function in the same manner, the accident has had a dramatic effect on her.

Prior to the accident plaintiff was employed by Cigna Insurance Company as an audio-video production manager. Thirteen months after the accident he returned to the same position. Cigna has provided reasonable accommodations for him by allowing him to sit for most of the day. Plaintiff has received positive reviews since returning to work. Despite his impairments, he not only has returned to his previous position with no decrease in earnings, but in fact, has received periodic increases in wages since the accident. At trial, plaintiff attempted to adduce the opinion of an expert to support his claim for diminished earning capacity. After *N.J.R.E.* 104 hearing, the evidence was disallowed.

The jury returned a verdict assessing liability for the accident as follows: plaintiff (5%), Maxson and Lion Corporation, Inc. (80%), and Atlantic City (15%). Plaintiff was awarded $150,000 for his pain and suffering and his wife was awarded $50,000 for her consortium loss. The verdict was then molded to reflect the fact that Atlantic City had been found 15% responsible with a final judgment entered for $22,500 and $7500, respectively.

Plaintiffs then filed a motion for a new trial on damages or additur which Atlantic City opposed. The trial judge granted this motion on April 12, 1996 as to both plaintiff's pain and suffering damages and his wife's consortium damages. Atlantic City then

filed a motion for leave to appeal from this order which was denied on May 31, 1996. Atlantic City also filed a motion for stay of the damages trial pending appeal which was denied on June 7, 1996.

Prior to the second trial, plaintiffs filed two motions with Judge Carol E. Higbee before whom the retrial on damages was to take place. The first motion sought an order permitting an expert to offer testimony as to John Dombroski's diminished earning capacity which testimony had been precluded at the first trial. The judge denied this application. Plaintiffs' second motion sought an order that the jury be informed of the assessment of percentages of liability from the first trial. The judge granted this motion. In response, Atlantic City filed an emergent application for leave to appeal from this order. Another panel of this court granted the motion for leave to appeal on November 1, 1996 and summarily reversed the trial judge's order with instructions that the jury not be informed of the prior allocation of liability.

The second damages trial commenced on November 4, 1996 before Judge Higbee and a jury. The evidence adduced as to damages at the second trial mirrored that which was adduced at the first except that Dr. Sagransky's testimony was omitted. The jury returned a verdict of $975,000 for plaintiff and $120,000 for his wife which was entered as a final judgment on November 18, 1996. Judgment was molded to reflect the prior assessment of liability for Atlantic City at 15%. Thus, Atlantic City was assessed at $164,250. Plaintiffs then filed a motion for a new trial on damages or additur which the court denied.

Atlantic City filed a notice of appeal, challenging the grant of plaintiffs' original motion for a second trial on damages. Plaintiffs then filed a notice of cross-appeal, challenging 1) the denial of their motion to admit their expert's testimony; 2) the denial of their request to instruct the second jury as to the prior assessment of liability; and 3) the denial of their motion for a new trial on damages or additur. We will deal with these issues serially.

## I

■ We turn first to Atlantic City's argument that the original trial judge erred in granting plaintiffs' request for a new trial. More particularly, Atlantic City contends that the jury's damage verdict was "not so disproportionate to the injury as to shock the conscience." The basis for Atlantic City's argument is that plaintiff's award was limited to pain and suffering and $150,000 was reasonable considering that all past and future medical expenses were paid for by third parties. Plaintiffs counter that the trial judge properly granted their motion since the injuries were "catastrophic" and the initial award was "shockingly low."

■ A trial judge may order a new trial when, "having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law." *R.* 4:49–1(a). In making this decision the trial judge "may not substitute his judgment for that of the jury merely because he would have reached the opposite conclusion; he is not a thirteenth and decisive juror." *Dolson v. Anastasia,* 55 *N.J.* 2, 6, 258 *A.*2d 706 (1969). Therefore, a jury's verdict "is entitled to very considerable respect. It should not be overthrown except upon the basis of a carefully reasoned and factually supported (and articulated) determination, after canvassing the record and weighing the evidence, that the continued viability of the judgment would constitute a manifest denial of justice." *Baxter v. Fairmont Food Co.,* 74 *N.J.* 588, 597–598, 379 *A.*2d 225 (1977).

■ A trial judge should thus not interfere with the "quantum of damages assessed by a jury unless it is so disproportionate to the injuries and resulting disabilities shown as to shock his conscience and to convince him that to sustain the award would be manifestly unjust." *Taweel v. Starn's Shoprite Supermarket,* 58 *N.J.* 227, 236, 276 *A.*2d 861 (1971); *R.* 2:10–1.

■ In reviewing a trial judge's decision to interfere with the quantum of damages awarded by a jury, we "must be concerned

with the same norm of decision." *Baxter, supra,* 74 *N.J.* at 599, 379 *A.2d* 225. However, we must accord due deference to the trial judge with respect to "intangibles" not transmitted by the record (e.g., credibility, demeanor, feel of the case) but otherwise make our own independent determination of whether a miscarriage of justice occurred. *Carrino v. Novotny,* 78 *N.J.* 355, 360, 396 *A.2d* 561 (1979); *Baxter, supra,* 74 *N.J.* at 597–598, 379 *A.2d* 225; *Dolson, supra,* 55 *N.J.* at 6–8, 258 *A.2d* 706.

Judge Winkelstein carefully canvassed the record and weighed the evidence as reflected in his written decision to overturn the jury's verdict. He stated:

> I am satisfied from my review of my trial notes and all of the exhibits admitted into evidence, as well as my feel of the case, that the jury made a mistake and its award was so disproportionate to plaintiff's injuries and resulting disabilities as to shock the conscience of the court. To sustain the award would be manifestly unjust.

In so concluding, the judge noted the severity of the accident and the physical injuries plaintiff suffered. Further, he considered how plaintiff "was previously an active person, engaging in camping and hiking" but now "[h]e can no longer engage in the types of activities that he did prior to the accident." In addition, he pointed out that

> The overall affect of the accident on Mr. Dombroski's life has been devastating. Problems with either leg, or even his left shoulder, individually, would require reasonable compensation in excess of the $150,000 awarded by the jury. Moreover, his disabilities when considered in their entirety are far worse than the injury to each individual body organ, member or function. It is the resultant loss and disability which are the key.... His past, present and future disabilities, being permanent and disabling, warrant reasonable compensation far in excess of the $150,000 award. The total effect of plaintiff's injuries will have a significant and serious impact on the rest of his life.

We think these findings and conclusions are fully supported by the record. We thus affirm as to the appeal substantially for the reasons expressed by Judge Winkelstein in his letter opinion of April 12, 1996.

## II

On cross-appeal plaintiffs contend it was error for the judge to bar the testimony of their expert, Dr. Wolf, on the

subject of diminished earning capacity. Defendant counters that both Judge Winkelstein and Judge Higbee correctly barred the proposed testimony because the expert's opinion was an inadequate basis upon which the jury could quantify the loss. We agree with defendant.

New Jersey recognizes that an injured party has the right to recover damages for diminished earning capacity. *Caldwell v. Haynes,* 136 *N.J.* 422, 433, 643 *A.*2d 564 (1994)(citing *Smith v. Red Top Taxicab Corp.,* 111 *N.J.L.* 439, 443, 168 *A.* 796 (E. & A.1933)). It is well-established that damages are recoverable "for the prospective consequences of a tortious injury." *Coll v. Sherry,* 29 *N.J.* 166, 174, 148 *A.*2d 481 (1959). However, it has been recognized by our Supreme Court that some accommodation is required in awarding future damages in order "to restrict the element of speculation." *Ibid.* Thus, "there can be no recovery for *possible* future consequences; they must be 'reasonably probable to follow.'" *Marty v. Erie Railroad Co.,* 62 *N.J.Super.* 458, 469, 163 *A.*2d 167 (App.Div.) (quoting *Budden v. Goldstein,* 43 *N.J.Super.* 340, 346, 128 *A.*2d 730 (App.Div.1957)), *certif. denied,* 33 *N.J.* 387, 164 *A.*2d 849 (1960).

The *Coll* court established a two prong test for determining when a jury may hear evidence regarding diminished earning capacity. Plaintiff must introduce evidence "showing there is a reasonable probability that his injuries will impair his future earning capacity, and sufficient factual matter upon which the *quantum* of diminishment can reasonably be determined...." *Coll, supra,* 29 *N.J.* at 176, 148 *A.*2d 481.

The *Coll* test was revisited by the Supreme Court in *Lesniak v. County of Bergen,* 117 *N.J.* 12, 563 *A.*2d 795 (1989). In *Lesniak,* damages for diminished earning capacity were sought for an injured infant. As to the first prong of the test, *Lesniak* noted that "reasonable probability" exists when "there is a permanent or lasting injury that would obviously impair the ability to earn." *Id.* at 22, 563 *A.*2d 795. Holding that the second prong is inapplicable to an infant, the court went on to recognize that, generally,

plaintiffs have a duty to "furnish the jury with 'some evidentiary and logical basis for calculating or at least, rationally estimating a compensatory award.'" *Id.* at 26, 563 *A.*2d 795 (quoting *Huddell v. Levin,* 537 *F.*2d 726, 743–44 (3d Cir.1976)).

As all parties and the trial judges recognized, plaintiff easily satisfies the first prong of the *Coll* test. The nature of plaintiff's injuries are permanent and debilitating, and in *Lesniak's* words, "would obviously impair his ability to earn," thus meeting the first prong of *Coll.*

■ It was up to plaintiff's expert, Dr. Wolf, to meet the second prong of *Coll:* to give the jury some evidentiary and logical basis for rationally estimating a compensatory award. Defendants made a motion *in limine* to bar Wolf from testifying on the basis that plaintiff was, at the time of the hearing, earning more than he was earning before the accident. Plaintiff countered that if he lost his job he would actually see the results of the accident on his earning capacity which would be much less than it was before the accident. The judge correctly recognized that the mere fact that plaintiff had his old job back with an increased salary did not foreclose diminished earning capacity damages. He ordered a *N.J.R.E.* 104 hearing to determine what the expert's "methodology was in coming to his conclusion that the earning capacity is reduced and that there is a reasonable determination as to what that diminishment is."

At the hearing Wolf opined that plaintiff has experienced a diminished earning capacity. He testified that there can be a loss of earning capacity even where actual earnings remain the same. Wolf arrived at this conclusion by looking at what would happen if plaintiff was to lose his job and seek other employment. His report calculated plaintiff's pre-injury expected earnings and fringes as $728,561 and his post-injury expected earnings and fringes (if forced to seek other employment) as $353,837. The difference is $374,724. With other adjustments, the report concluded plaintiff's loss, if he sought other employment, would be $416,357. However, Wolf acknowledged that he never performed

a statistical analysis of the probabilities of plaintiff losing his job or seeking other employment.

When the judge asked Wolf to quantify plaintiff's alleged lost earning capacity, Wolf opined that it was

The difference between what he would be earning at Cigna versus his earnings in alternative employment that represents the loss of power to earn even though as long as he continues to be employed at Cigna, that's not resulted in actual out of pocket loss. I guess the best example I can give is if I have a Corvette that can go 160 miles an hour and someone does some damage to the engine and it can only go 80 miles an hour, as long as I don't want to go more than 80 miles an hour, the damage to the engine has no consequence to me. But if I wanted to go faster, if I had to go faster, then it would be a consequence.

      \*      \*      \*      \*      \*      \*      \*      \*

If there's no need for him to use his skills outside of Cigna, there is no actual loss, but there is that loss of capacity which may translate into an economic loss in the future given the lack of employment at Cigna.

Judge Winkelstein found there were no facts upon which to reasonably assess the possible damages because plaintiff failed to demonstrate to some reasonable degree of probability that he was going to lose his job.

The only evidence is that he went back to work and he's doing his job. He's getting paid for the work that he's doing. He's a valued employee. He's doing a good job. And he's getting paid and he's getting raises and he's getting good personnel notes in his file.

There really is no evidence before a Court from which I could conclude that there is any type of probability that he's going to lose his job. There's no evidence as when he would lose his job. If he lost his job tomorrow or if he lost his job in ten years, certainly that would affect the amount of diminishment, of earning capacity if you were to quantify that in terms of dollars. And it has to be quantifiable in terms of dollars or it can't go to the jury.

A net opinion is an opinion that's a conclusion unsupported by factual evidence and that's inadmissible. The law's clear that the weight to which an expert opinion is entitled can rise no higher than the facts and reasoning upon which that opinion is predicated. And what we have here, we have a plaintiff who is seriously injured, but he went back to work. He's earning as much or more now than he was before. There was no evidence to show that his company is down sizing. There is no evidence to show that he is not doing his job. There is no evidence to show that he's doing a bad job. The evidence is to the contrary.

I'm satisfied that there aren't sufficient facts to show the quantum of diminishment.

Prior to the second trial on damages plaintiff again sought an order permitting Wolf's testimony. Judge Higbee also denied this

application. She determined that in order for a witness to testify about lost earning capacity "there has to be a reasonable probability of loss...." She found "there has to be some testimony of a statistical analysis that under the facts of the particular case it's likely or probable that at some point in the future the person's going to become unemployed or change jobs or need to change jobs...." Thus, the judge barred Wolf's testimony because he was unable to testify with regard to the probability of loss.

■ Diminished earning capacity encompasses many things beyond loss of a particular job. It has been said that the issue is whether the worker's economic horizons have been shortened as a result of the tortfeasors negligence. *Ruzzi v. Butler Petroleum Co.*, 527 *Pa.* 1, 13, 588 *A.*2d 1, 7 (1991) (allowing an expert's testimony regarding diminished earning capacity as to the statistics of what plaintiff would earn if forced to compete in an open job market). Thus, it can be approached from many different directions by an expert. In this case, the focus was on the result if plaintiff lost his job because that was the only phase of diminished earning capacity for which Wolf supplied any quantification. Unfortunately, Wolf neglected to provide what we (as did the trial judges) view as the lynchpin of such an analysis: evidence as to the probability of plaintiff leaving his job either by choice or involuntarily. This evidence could be adduced generally through unemployment statistics as to those in plaintiff's age bracket, job title and industry or through an analysis of upward mobility patterns of employees within plaintiff's industry. It is this number which would have to be applied to Wolf's projected loss figure to give the jury a basis for quantifying the diminution in plaintiff's earning capacity. Without it, Wolf's partial quantification is of no value. Contrary to plaintiffs' argument, this is not a discount to present value. It is the application of a probability factor to a gross projected loss. In the absence of such evidence or any other meaningful evidence of diminished earning capacity from which a jury could quantify such a loss, a jury verdict on this subject

would have been sheer speculation. As such, the judges did not err in denying plaintiff's motion to present Wolf as a witness.

## III

We turn next to the so-called ultimate outcome charge. We agree with plaintiff that the second jury should have been made aware of the first jury's assessment of liability under *Roman v. Mitchell,* 82 *N.J.* 336, 413 *A.*2d 322 (1980). This was not a bifurcated trial. *See Chavanne by Chavanne v. Clover Fin. Corp.,* 206 *N.J.Super.* 72, 501 *A.*2d 1024 (App.Div.1985). It was a joint trial of liability and damages, the damages portion of which had to be retried. The first jury in this joint trial of liability and damages obviously was possessed of the liability breakdown and we see no reason why the second jury should not have been so instructed. *See Fischer v. Canario,* 143 *N.J.* 235, 670 *A.*2d 516 (1996). However, our painstaking review of the record, including the substantial damages awarded, has led us to conclude that the absence of the first jury's assessment of liability did not lead the second jury to a result which it otherwise would not have reached and that it constituted harmless error. *R.* 2:10–2.

## IV

Plaintiffs' last contention is that Judge Higbee erred by denying their motion for a new trial on damages or additur after the second trial. We disagree. In reaching her conclusion, Judge Higbee carefully canvassed the record and weighed the evidence. In our view, she correctly found that the damages awarded were not so disproportionate to plaintiff's injuries as to shock the conscience and that the jury verdict was not against the weight of the evidence such that there was a miscarriage of justice under the law. *R.* 2:10–1. On a complete review of the record, and according deference to the trial judge with respect to the intangibles not transmitted by the record, we are satisfied that no miscarriage of justice occurred. *Carrino, supra,* 78 *N.J.* at 360,

396 *A*.2d 561; *Baxter, supra,* 74 *N.J.* at 597–598, 379 *A*.2d 225; *Dolson, supra,* 55 *N.J.* at 6–8, 258 *A*.2d 706.

In sum, we affirm.